# WELCH & SMITH, P.C.
LAWYERS
6440 AVONDALE DRIVE
SUITE 206
OKLAHOMA CITY, OK 73116
TELEPHONE: (405) 286-0801
FACSIMILE: (405) 286-0301
E-MAIL: WS@WELCHSMITH.COM

MORT G. WELCH
MWELCH@WELCHSMITH.COM

SHERRY L. SMITH
SSMITH@WELCHSMITH.COM

September 15, 2011

Rachel L. Bussett
Bussett Law Firm P.C.
3555 NW 58th Street, Suite 1010
Oklahoma City, Oklahoma 73112

RE:   ***Steven Hayes v. State Farm Fire & Casualty Co..***, Case No. 10-CV-680-HE,
       **United States District Court for the Western District of Oklahoma**

Dear Ms. Bussett:

This report is submitted pursuant to Rule 26(a)(2)(B), Federal Rules of Civil Procedure, in my capacity as an expert witness on behalf of your client, the plaintiff Steven Hayes, in the case referenced above. The defendant is referred to in this report as State Farm.

## I.  EDUCATION.

I received a Bachelor of Arts degree with special distinction from the University of Oklahoma in 1972. I received a juris doctorate degree from the University of Texas School of Law in 1975.

## II.  EXPERIENCE AND QUALIFICATIONS.

I have been continuously engaged in the practice of law, almost exclusively in civil law matters since 1975. I was employed in 1975 and 1976 by a general practice law firm in Harlingen, Texas. From 1976 to 1978, I was an associate with Cooper, Stewart, Elder and Abowitz, in Oklahoma City, a civil litigation firm which handled many cases involving bodily injury tort and insurance claims. In 1978 I was a founder of Abowitz and Welch, and was a shareholder in this law firm, later known as Abowitz, Welch and Rhodes, until 1995. In 1995, I was a sole practitioner. In 1996 I formed another law firm, Welch, Jones & Smith, with Laurie W. Jones and Sherry L. Smith. In 2000 this firm became Welch and Smith.

My practice since 1976 has consisted of civil litigation of all types, including insurance coverage and insurance bad faith cases, and advising insurers, insureds, lawyers and public adjusters concerning rights and obligations under insurance policies. This advice has resulted in the preparation of over a thousand written opinions concerning a wide variety of

EXHIBIT
10

July 18, 2011
Page 2

issues arising as a result of claims made under insurance policies. I have reviewed and approved preparation of numerous insurance coverage opinions by other lawyers. I have prosecuted and defended multiple insurance bad faith and breach of insurance contract claims under a wide variety of policies, including homeowners policies.

My experience in insurance litigation and as an advisor to insurers, insureds, lawyers and public adjusters has involved issues under all of the coverage parts of umbrella and excess liability insurance policies; motor carrier policies; personal and business auto policies; homeowners and farmowners policies; professional liability policies; directors and officers liability and corporate indemnification policies; commercial general liability and property coverage forms; umbrella policies; and reinsurance contracts. I have personally supervised hundreds of investigations of claims and personally conducted such investigations, including hundreds of claims under the property coverages of homeowners and farmowners policies. I have trained adjusters and their supervisors concerning claims investigation techniques and procedures, the construction and interpretation of insurance policies, insurance case and statutory law, evaluation of bodily injury and property loss claims under both first and third party coverages, including claims under the property coverages of homeowners, farmowners and commercial policies, and standards for claims handling intended to comply with the covenant of good faith and fair dealing. I have evaluated thousands of claim files for insurers and insureds (and their lawyers) to determine if the files include all information appropriate to make a determination concerning coverage, liability, and damages, and whether the investigation and handling of the claim is consistent with the obligation of good faith and fair dealing.

Cases resulting in published trial or appellate court opinions in which I was either trial or appellate counsel include the following: Akin v. Ashland Chem. Co., 156 F.3d 1030 (10th Cir. 1998) cert. den'd 526 U.S. 1112 (1994); Allstate Ins. Co. v. Fox, 139 F.3d 911 (Tab.), 1998 WL 77745; Angelo v. Armstrong World Industries, 11 F.3d 957 (10th Cir. 1993); Beeman v. Manville Corp. Asbestos Disease Compensation Fund, 496 N.W.2d 247 (Iowa 1983); Bristol v. Fibreboard Corp., 789 F.2d 846 (10th Cir. 1986); Case v. Fibreboard Corp., 1987 OK 79, 743 P.2d 1062; Cofer v. Morton, 1989 OK 159, 784 P.2d 67; Coleman v. Turpen, 697 F.2d 1341 (10th Cir. 1982), app. after remand, 827 F.2d 667 (10th Cir. 1987); First Financial Ins. Co. v. Roach, 80 F.3d 420 (10th Cir. 1996); Fisher v. Owens Corning Fiberglass Corp., 868 F.2d 1175 (10th Cir. 1989); Fleming v. Hall, 1981 OK 155, 638 P.2d 1115; Grain Dealers Mut. Ins. Co. v. Farmers Alliance Mut. Ins. Co., 298 F.3d 1178 (10th Cir. 2002); GuideOne Mutual Ins. Co. v. The Shore Ins. Agy., 2011 OK CIV APP 69, ___ P.3d ___ (cert. den'd May 23, 2011); Horace Mann Ins. Co. v. Johnson, 953 F.2d 575 (10th Cir. 1991); Huff v. Fibreboard Corp., 836 F.2d 473 (10th Cir. 1987); Kerr-McGee Corp. v. Admiral Ins. Co., 1995 OK 102, 905 P.2d 760; Lindsey v. Dayton-Hudson Corp., 592 F.2d 1118 (10th Cir. 1979), cert. den'd. 444 U.S. 856 (1979); Livengood v. Thetford, 681 F.Supp. 695 (W.D. Okla. 1988); Mulford v. Neal, 2011 OK 20, ___ P.3d ___ (not yet rel'd for off. pub.); Oklahoma Farmers Union Mut. Ins. Co. v. John Deere Ins. Co., 967 P.2d 479 (Okla. Civ. App. 1998); Sargent v. Central Nat'l Bank & Trust Co. of Enid, Oklahoma, 809 P.2d 1298 (Okla. 1991); Short v. Oklahoma Farmers Union, 619 P.2d 588 (Okla. 1980); Snethen v. Oklahoma State Union of the Farmers' Edu. and Coop. Union of Am., 664 P.2d 377 (Okla. 1983); State Farm Mut. Ins. Co. v. Schwartz,

July 18, 2011
Page 3

933 F.2d 848 (10th Cir. 1991); Takagi v. Wilson Foods Corp., 662 P.2d 308 (Okla. 1983); Tax Investments Concepts Inc. v. McLaughlin, 670 P.2d 981 (Okla. 1982); Thiry v. Armstrong World Industries, Inc., 661 P.2d 515 (Okla. 1983); Timberlake Const. Co. v. U.S. Fid. & Guar. Co., 71 F.3d 335 (10th Cir. 1995); Trinity Univ. Ins. Co. v. Broussard, 932 F.Supp. 1307 (N.D. Okla. 1996); Vilseck v. Fibreboard Corp., 861 S.W.2d 659 (Mo. App. 1993); Weber v. State ex rel. Dept. of Human Serv., 839 P.2d 672 (Okla. Civ. App. 1990); Wilson and Co. v. Reed, 603 P.2d 1172 (Okla. Civ. App. 1979); Wilson Foods Corp. v. Noble, 613 P.2d 485 (Okla. Civ. App. 1980); and Wilson Foods Corp. v. Porter, 612 P.2d 261 (Okla. 1980).

I participated in drafting the anti-stacking provisions of uninsured motorist coverage subsequently upheld by the Oklahoma appellate courts in Withrow v. Pickard, 905 P.2d 800 (Okla. 1995); Breakfield v. Oklahoma Farmers Union Mut. Ins. Co., 910 P.2d 991 (Okla. 1995); and Kinder v. Oklahoma Farmers Union Mut. Ins. Co., 943 P.2d 617 (Okla. Civ. App. 1997). I have drafted and revised many other types of clauses for use in various insurance policies, including insurance agents professional liability, umbrella/excess liability, commercial general liability, commercial property, auto, homeowners, farmowners, and dwelling policies. I have prepared drafts of entire business and personal auto policies.

I was a member of the State Bar of Texas from 1975 and continuing for several years until I discontinued my membership after moving to Oklahoma to practice. I have been a member of the Oklahoma Bar Association since 1976. I am admitted to practice in all federal district courts in Oklahoma, the Tenth Circuit Court of Appeals, and the United States Supreme Court. I have also been admitted to practice *pro hac vice* in several trial and appellate courts outside of Oklahoma, including federal and state trial courts in Arkansas, Kansas, Missouri, Illinois, Arizona, Pennsylvania, California, New Jersey, New Mexico, Ohio and Texas. I have also been admitted *pro hac vice* before the Supreme Court of Iowa, and the Missouri, Illinois and Kansas intermediate appellate courts.

I am a member of the International Association of Defense Counsel, the American Bar Association, its Tort and Insurance Practice Section, and the Defense Research Institute. I was for many years a member of the Oklahoma Association of Defense Counsel.

I have lectured and prepared seminar materials for continuing legal education programs sponsored by Oklahoma Bar Association, Oklahoma Association of Defense Counsel, Oklahoma Trial Lawyers Association, University of Oklahoma School of Law, Oklahoma City University School of Law, and The Conference on Consumer Finance Law. These presentations have been approved as continuing education programs for Oklahoma lawyers, Oklahoma and Texas adjusters, and Oklahoma insurance agents. Selected titles include: *Allocation of Fault-Identifying All Angles*, OBA CLE (Feb. 1989); *Identifying and Using Insurance Coverages Commercial Liability*, OBA CLE (Feb. 1990); *Documenting the Agreement*, OBA CLE (Dec. 1991 and Mar. 1995); *Replacement Cost Property Insurance Coverage Without Replacement: Coblentz v. Oklahoma Farm Bureau Mut. Ins. Co.*; The Conf. on Cons. Fin. Law (Dec. 1996); *There are Many People Who Want Your Client's UM Money: Pitfalls in the Settlement of UM Claims*, OBA &

July 18, 2011
Page 4

Oklahoma Insurance Department approved CE (Oct. 2009); *Substantial Certainty Tort Claims By Injured Employees Against Their Employers: What Workers Compensation Professionals Should Know*, 11th Annual Spring Insurance Update Seminar (April, 2010, Oklahoma City/Dallas), an Oklahoma Insurance Department approved CE; and *Basic Elements of Auto Liability Coverage and Case Law Restrictions, What Must be Proved to Prevail on a UM Claim, The Interface Between Auto Liability and UM Coverages when the Claim's Value Potentially Exceeds the Liability Coverage Limit*, Last Minute Continuing Legal Education (Leflore County Bar Ass'n. Dec. 16, 2010). I was program planner and moderator for the OBA and Oklahoma Insurance Department approved CE Seminar, *What The Other UM Seminars Didn't Tell you: How To Settle And (If All Else Fails) Try UM Cases* (Oct. 2009).

I have presented client positions on insurance coverage issues to the Oklahoma Insurance Department and advised that department informally on insurance coverage issues. I have participated in drafting proposed legislation relating to insurance in Oklahoma and Idaho. This includes bills in various sessions of the Oklahoma legislature to amend the Oklahoma Declaratory Judgment Act, 12 O.S. §1651, to permit declaratory judgments concerning issues arising under liability insurance policies. The Act was amended, effective November 1, 2004, to permit liability insurance policy declaratory judgment actions, as the courts have subsequently held in Knight v. Miller, 195 P.3d 372 (Okla. 2008) and Equity Ins. Co. v. Garrett, 178 P.3d 211 (Okla. Civ. App. 2008). I also participated in the revision of the motor vehicle insurance laws in Title 47 of the Oklahoma Statutes contained in Senate Bill 1161, which was passed by the first regular session of the 2009 Legislature.

### III. **PRIOR TESTIMONY.**

I have testified by deposition as an expert witness in the following insurance cases:

Allen v. Lynn Hickey Dodge, No. CJ-96-6076, District Court of Oklahoma County, Oklahoma, on February 7, 2003 for the plaintiffs and their attorney, Ed Abel; Anders v. GEICO, No. CJ-2002-6387, District Court of Tulsa County, Oklahoma, on September 18 and September 19, 2003 for the defendant GEICO and its attorney, Jerry Pignato; Arrow Exterminators Inc. v. Mid-Continent Cas. Co., No. CJ-2000-1558, District Court of Tulsa County, Oklahoma, on June 3, 2004 for the defendant, Mid-Continent Casualty Co. and its attorney, Roger Butler; GuideOne Mut. Ins. Co. v. Smith, No. CIV-03-1087-F, United States District Court for the Western District of Oklahoma, on October 28, 2004 for the defendants and their attorney, Joe E. White, Jr.; Gutkowski v. Oklahoma Farmers Union Mut. Ins. Co., No. CJ-04-7542-62, District Court of Oklahoma County, Oklahoma on November 16, 2005 for the defendant and its attorney, David Donchin; Horn v. GEICO, No. CIV-02-0058, United States District Court for the Western District of Oklahoma, on October 10, 2002 for the defendant GEICO and its attorneys, Baker and McKenzie; Hutchinson v. United Services Auto. Assoc., No. C-98-596, District Court of Pittsburgh County, Oklahoma for the defendant, Oklahoma Farmers Union Mutual Insurance Company and its attorney, W. G. "Gil" Steidley; Melton Truck Lines Inc. v. Indemnity Ins. Co. of North America, No. CV-263-JHP-SHA, Northern District of Oklahoma, on August

July 18, 2011
Page 5

2, 2007 for the defendant and its attorney, Robert Rivera, Jr. of Susman, Godfrey LLP; Ward v. Oklahoma Farmers Union Mut. Ins. Co., No. C-04-603, District Court of Pontotoc County, on September 8, 2005 for the defendant and its attorney, David Donchin; Cordova v. Oklahoma Farm Bureau Ins. Co. and Colin McNatt, No. CJ-2008-1557, District Court of Oklahoma County on November 16, 2009 for plaintiff and her attorney Gregg W. Luther of West Law Firm; Cearley v. Great American Ins. Co. of New York, No. CJ-2008-1202, District Court of Creek County on January 21, 2010 for plaintiff and his attorneys, W.G. "Gil" Steidley and Whitney Eschenheimer, Steidley & Neal; Tate v. Allstate Ins. Co., Case No. 10-CV-104-R, United States District Court, Western District of Oklahoma on February 16, 2011, for the plaintiff and his attorney, Gregg W. Luther of West Law Firm; Sherwood Construction Company, Inc. v. American Home Assurance Company, et al., Case No. 5:09-cv-1395-HE, United States District Court for the Western District of Oklahoma on April 13, 2011, for the defendants and their attorney, Linda M. Szuhy of Thompson, Coe, Cousins & Irons; and David Gregory Miller v. Farmers Ins. Grp., et al., Case No. CIV-10-466-F, United States District Court for the Western District of Oklahoma, on July 8, 2011, for the plaintiff and his attorneys Logan Johnson and Brad Miller, of Durbin, Larimore & Bialik.

I have testified at trial as an expert witness in the following insurance bad faith cases:

Anders v. GEICO; Gutkowski v. Oklahoma Farmers Union Mut. Ins. Co.; Tate v. Allstate Ins. Co. and Nelson v. Granite States Ins. Co., Case No. CIV-08-1165, United States District Court for the Western District of Oklahoma.

I testified as an expert witness by deposition for the defendants and their attorney, James K. Secrest, in a legal malpractice case, Wheat v. Richardson, No. CJ-2007-7248, District Court of Tulsa County, Oklahoma on October 13, 2009.

In Gutkowski, Hutchinson, and Ward, my expert opinions were offered on behalf of the client I represented, and not as a retained expert.

## IV. COMPENSATION.

I am charging your firm $275.00 per hour for my services as an expert witness on behalf of your client in this case.

## V. DOCUMENTS REVIEWED.

I have reviewed the following: pleadings and orders in the case referenced above; copy of homeowners policy 36-BB-L172-2, issued by State Farm to Steven N. Hayes for the policy period of July 28, 2008 to July 28, 2009 [POLICY 1-40]; portions of State Farm's Operation Guide of various dates [HAYES 42PROD-150PROD]; State Farm Activity Log for claim number 36-F609-597 [SF1-13]; Activity Log for claim number 36-F612-002 [SF68-85]; correspondence and drafts thereof and emails regarding claim number 36-F612-002 [SF87-110] and claim number 36-F609-597 [SF35-40, 111-124]; copies of photographs of the boat dock which is the subject of the claims described above [SF43-45,

July 18, 2011
Page 6

47-65]; estimate and invoice for dock repairs by Affordable Dock Service [SF41-42, 47]; weather data obtained from the National Climatic Data Center and the Oklahoma Climatological Survey; depositions of Steven Hayes and Kathy Romanello and exhibits thereto; relevant insurance industry publications, statutes and case law indentified in this report.

You have advised me that additional depositions are scheduled to be taken and discovery is not yet complete. Therefore, I reserve the right to amend or supplement this report as appropriate upon review of any additional data which I did not review in preparation of this report.

## VI.  EXHIBITS.

I have not definitively decided which if any exhibits to use in the course of my testimony but I anticipate they will include the documents produced by State Farm which are identified in section V, *supra*.

## VII.  LEGAL CONTEXT OF MY OPINIONS.

I have been requested generally to evaluate whether State Farm breached the covenant of good faith and fair dealing in handling the claims of Steven Hayes under the property coverage of his homeowners policy. In this report I use the shorthand phrase "bad faith" to describe conduct which I believe violates the covenant of good faith and fair dealing implied into every insurance contract by operation of Oklahoma law. Specifically, I have evaluated the handling of Steven Hayes' claims to determine whether State Farm's interpretation and application of Mr. Hayes' policy, and its investigation, evaluation, and decision not to pay his claims, were "reasonable under the circumstances", and whether State Farm "failed to deal fairly and act in good faith towards [Mr. Hayes] in handling of the...claim".[1] These issues often must be addressed in a bad faith case because insurers have both a "contractual duty to *timely* and *properly* pay a claim", and "a duty to *timely* and *properly* investigate an insurance claim".[2] The central question in every bad faith case is "what did the insurance company know or what should it have known at the time the insured requested payment under the applicable policy, i.e. whether the insurer had a justifiable, reasonable basis to withhold payments when the insured requested the carrier to perfect its contractual obligation?[3]

The assessment of whether State Farm applied the policy language in a manner consistent with applicable law necessarily must be considered, because an "insurer is held to knowledge of the applicable Oklahoma law, and the reasonableness of its decision must be judged in light of that law".[4] Accordingly, it must be aware of the legal interpretation of

---

[1] *Quoting from* Brown v. Patel, 157 P.3d 117, 129 (Okla. 2007).

[2] *Id.* at 122 (emp. by ct.).

[3] Heffron v. District Court of Okla. County, 77 P.3d 1069, 1077 (Okla. 2003).

[4] Quoting from Willis v. Midland Risk Ins. Co., 42 P.3d 607, 612 (10th Cir. 1994) (Okla. law). *See also,* Brown v. Patel, 157 P.3d at 122 ("bad-faith actions have been based upon an insurer's failure to follow judicial construction of insurance contracts or available applicable law"); Wolf v.

July 18, 2011
Page 7

the language of its policies. In addition, one key component of "good faith and fair dealing" is the recognition that "[a]n insurer may not treat its own insured in the manner in which an insurer may treat third-party claimants to whom no duty of good faith and fair dealing is owed".[5]

In the course of evaluating State Farm's handling of Mr. Hayes' claims, I have taken into account not only what State Farm did or did not do in the handling of the claims, but the legal, insurance industry, and internal State Farm standards applicable to the handling of insurance claims, the training or lack thereof of State Farm's claims representatives, and my experience of more than thirty years in conducting and supervising the investigation, evaluation, and litigation of insurance claims, including claims under the property coverages of homeowners policies.[6]

---

Prudential Ins. Co. of Am., 50 F.3d 793, 799-800 (10th Cir. 1995) (Okla. law – because insurers are "obviously well aware" of the principle that ambiguity in policy language is construed most favorably to the insured, "mere ambiguity" in policy language "cannot, as a matter of law, create a defense to a bad faith claim"); and Barnes v. Oklahoma Farm Bur. Mut. Ins. Co., 11 P.3d 162, 171 (Okla. 2000) (insurer did not follow "the law readily available to insurer and its counsel" in the application of the Oklahoma Uninsured Motorist Statute, 36 O.S. §3636); Crews v. Shelter Gen. Ins. Co., 393 F.Supp.2d 1170, 1178 (W.D. Okla. 2005); (insurer charged with knowledge that Oklahoma law requires proof of intent to deceive before insurer can rescind policy for misrepresentation).

[5] Newport v. USAA, 11 P.3d 190, 196 (Okla. 2000).

[6] The following cases recognize the usefulness of such evaluations by expert witnesses in insurance bad faith cases under Oklahoma law: Vining v. Enterprise Fin. Grp., Inc., 148 F.3d 1206, 1217-18 (10th Cir. 1998) (expert opinion testimony, Oklahoma Insurance Department's Market Examination Report of the defendant insurer and the insurer's training manual were relevant and admissible to show the insurer "engaged in a pervasive, consistent pattern of abusive rescissions" of health insurance policies); Ford v. Allied Mut. Ins. Co., 72 F.3d 836, 844 (10th Cir. 1996) (expert testimony on insurance industry standards admissible in bad faith case for failure to pay uninsured motorist claim); Seikel v. American Med. Sec. Life Ins. Co., 2007 WL 4864462 at *1 (W.D. Okla. May 11, 2007) ("Where the court determines that such [expert] testimony will assist the trier of fact in understanding practices and procedures in the insurance industry or related matters presented by the circumstances of a particular case, expert testimony is proper" because "the average juror is not likely to be familiar with the practices and procedures involved in processing insurance claims"); Johnson v. Gov't Employees Ins. Co., 2008 WL 4186216 at *2 (W.D. Okla. Sept. 8, 2008) (lawyer with 30 years plus experience in insurance litigation qualified to testify in uninsured motorist bad faith case, "drawing from both his understanding of the law and his experience with respect to how claims should be handled by an insurance company") and 2008 WL 5545261 at *2 (W.D. Okla. Sept. 5, 2008) (expert "may testify regarding the insurance industry's custom and practice in completing an injury evaluation, appropriate reasons for foregoing a written evaluation, and that under the facts presented in this case" the expert "himself would forego a written evaluation"); Payne v. GEICO Indem. Co., 2002 WL 34439222 at *2 (W.D. Okla. May 17, 2002) (experts "will be permitted to testify as to the custom and practice of the industry in investigating and handling claims", and "as to considerations in evaluating an insured's claim, based on industry custom and practice and/or their own experience"); Metzger v. American Fid. Assur. Co., 2008 WL 7180759 at *2-3 (W.D. Okla. Jan. 28, 2008) (allowing expert testimony on cancer policy bad faith claim); and Milburn v. Life Investors Ins. Co. of Am., 2008 WL 3539260 at *2 (W.D. Okla. Jan. 19, 2008)

July 18, 2011
Page 8

## VIII.  LIMITATIONS ON MY OPINIONS.

I am fully aware that my role as an expert witness is not to tell a jury what law applies in this case for only the Court has this responsibility.  Likewise, I am aware that, as an expert witness, my opinions concerning motives, state of mind or credibility of any particular witness is likely not admissible since those are matters which juries are capable of deciding without experts telling them what they believe the motive, state of mind, or intent of one of the actors is.[7]  I also recognize the Court has discretion to exclude any expert opinion on ultimate issues, such as whether an insurance company did or did not act in bad faith, or even whether the conduct of an insurance company did not did not violate a particular law or insurance industry standard.[8]  Nevertheless, because of the requirements for expert witness reports in Rule 26, and in light of the broad discretion vested in the Court, it is appropriate for an expert witness in a bad faith case, in my view, to express all opinions which potentially will be admissible at trial in his or her report.

## IX. IDENTIFICATION OF STANDARDS.

Consistent with the law governing the admission of expert testimony in insurance bad faith cases, this section identifies standards, customs and practices which, in my opinion, are relevant to my consideration of the investigation, evaluation and decision not to pay Mr. Hayes' claims under his homeowners policy for damage to his boat dock located adjacent to Grand Lake O' The Cherokees at Langley, Oklahoma.

### A.  LEGAL STANDARDS.

Many sources of law impact the application and interpretation of insurance policies, as well as the proper investigation and evaluation of claims under insurance policies.  As noted earlier, insurance companies are charged with the knowledge of these laws.  A specific statutory source of standards applicable to the insurance industry in Oklahoma is the Oklahoma Unfair Claims Practices Act, 36 O.S. §§ 1250.1-1250.17 ("OUCPA").  The OUCPA includes sections adopted as a model act by the National Association Of

---

(proposed testimony of insured's expert "appropriately focuses on the reasonableness of [insurer's] handling and investigation of Milburn's coverage under the terms of her insurance policy").

[7] This view is in accord with those courts which have held experts may not express opinions in bad faith cases concerning such matters.  *See e.g.,* Johnson v. Gov't Employees Ins. Co., 2008 WL 5545621 at *2-3 (W.D. Okla. Sept. 5, 2008); North Am. Spec. Ins. Co. v. Britt Paulk Ins. Agy., Inc., 2007 WL 2688167 at *3 (E.D. Okla. Sept. 10, 2007).

[8] *See e.g.,* Thompson v. State Farm Fire & Cas. Co., 34 F.3d 932, 939-40 (10th Cir. 1994); American Comm. Ins. Co. v. Harris, 2009 WL 130225 at *1 (W.D. Okla. Jan. 16, 2009); Johnson v. Government Emp'ees Ins. Co., 2008 WL 4186216 at *2 (W.D. Okla. Sept. 8, 2008) and 2008 WL 5545261 at *3; Seikel v. American Med. Sec. Life Ins. Co., 2007 WL 4859272 at *3-4 (W.D. Okla. Feb. 26, 2007); Matlock v. Texas Life Ins. Co., 2006 WL 5097313 at *1 (W.D. Okla. Feb. 8, 2006); and Payne v. GEICO Indem. Co., 2002 WL 34439222 at *2 (W.D. Okla. May 17, 2002).

July 18, 2011
Page 9

Insurance Commissioners.[9]  The model act or versions of it have been adopted in most states, and contains standards based upon a consensus understanding of good claims handling procedures.[10]  The standards in the OUCPA (and implementing regulations in some states) provide guidance for claims handling based upon extensive experience of the insurance regulators of the several states: "The National Association of Insurance Commissioners (NAIC) created the Unfair Claims Settlement Practices Act 'to set forth standards for the investigation and disposition of claims arising under policies or certificates.'"[11]  Accordingly, the standards in the OUCPA may be considered in evaluating an insurer's conduct in a bad faith case[12] even though, as in Oklahoma, a violation of the OUCPA does not give rise to a private cause of action.[13]

Other specific laws which are relevant to my evaluation are identified in section X, *infra*.

## B. INDUSTRY STANDARDS.

Industry standards necessarily incorporate applicable law but the insurance industry also recognizes other appropriate practices for claims handling.  A fundamental claims practice is to conduct an investigation which is unbiased and objective and, at a minimum, gives equal consideration to the interest of the claimant/insured. [14]  This standard is consistent with the Oklahoma law quoted earlier which prohibits an insurer from treating its own insured in the same manner it may treat a third party claimant to whom no duty of good faith and fair dealing is owed.  Consistent with this standard, adjusters and their supervisors should pursue all information which is potentially relevant to a claim, and especially information that will establish the compensability of the claim. [15]

---

[9] See one of the major insurance industry publications, FC&S BULLETINS, *Personal Lines Volume* at Vcp-1 (Nat'l Underw. Co. 2003).

[10] *See e.g.,* Moradi-Shalal v. Fireman's Fund Ins. Co., 758 P.2d 58, 63 Cal. 1988; Earth Scientists (Petro Services Ltd.) v. United States Fid. & Guar. Co., 619 F.Supp. 1465, 1470 (D. Kan. 1985); and an article by a leading insurance industry lawyer, Houser, *The Unfair Claims Settlement Practices Act*, 15 THE FORUM 336 (1979).

[11] FC&S BULLETINS, *supra.*, note 8 at Vcp-1.

[12] *See e.g.,* Beers v. Hillory, 241 P.3d 285, 293-94 (Okla. Civ. App. 2010) (OUCPA "can provide the district court with guidance in determining whether particular conduct on the part of an insurer is unreasonable and sufficient to constitute a basis for a bad faith action"); Heyden v. Safeco Title Ins. Co., 498 N.W.2d 905, 909-911 (Wis. App. 1993) *rev. den'd* 508 N.W.2d 421 (Wis. 1993), *overruled on other gds. by* Weiss v. United Fire & Cas. Co., 541 N.W.2d 753 (Wis. 1995); Walston v. Monumental Life Ins. Co., 923 P.2d 456, 460-61 (Idaho 1996); Inland Grp. of Cos. v. Providence Washington Ins. Co., 985 P.2d 674, 683 (Idaho 1999); Romano v. Nationwide Mut. Fire Ins. Co., 646 A.2d 1228, 1232-33 (Pa. Super. 1994); Miglicio v. HCM Claims Mgmt. Corp., 672 A.2d 266, 271 (N.J. Super. L. Div. 1995); and MacFarland v. United States Fid. & Guar. Co., 818 F.Supp. 108, 110-111 (E.D. Pa. 1993).

[13] As held in Walker v. Chouteau, 849 P.2d 1085, 1087 (Okla. 1993) and Gianfillippo v. Northland Cas. Co., 861 P.2d 308, 310 (Okla. 1993).

[14] *See e.g., Claims Handling Principles & Practices* §§2.37 and 5.3 (American Institute for Chartered Property Casualty Underwriters 2006).

[15] See e.g., *Id.* §5.25.

July 18, 2011
Page 10

Many claims also require the utilization of experts since adjusters and their supervisors typically work on a wide variety and number of claims and have not developed the expertise in a specific subject matter which may be necessary to evaluate certain issues which arise with a claim, such as the causation of damage.[16]

Adequate documentation of the life of a claim is also a standard recognized by the insurance industry. Documentation provides a record of the handling of the claim which may be used for a variety of purposes. The job performance of the claims personnel and claims department may be evaluated in part upon this documentation. Insurance regulators may review this documentation in the discharge of their regulatory duties. Obviously, in bad faith litigation, the documentation is important to assess the propriety of the handling of the claim.

Proper documentation includes identifying all persons with whom contact is made or who may provide relevant information about a claim, and what those persons say. Proper documentation also describes the significant actions the adjuster took to investigate and evaluate the claim, the content of communications within the claims department and with third parties and with whom those communications were had, a description of the reasoning of the adjuster and a supervisor, if any, for the evaluation of a claim, and a description of the reasons for the decision to pay or deny payment of a claim.

The insurance industry also utilizes various investigative tools, some of which are provided for in standard clauses in insurance policies. The use of recorded statements of potential witnesses, including the claimant/insured, is a device to eliminate any later dispute about what the witness told the adjuster, and to provide a permanent record.

---

[16] *See e.g.* Cozen, *Insuring Real Property* § 20105 (Lexis Nexis Matthew Bender 2009), *Managing Bodily Injury Claims* at 2-14 (American Institute for Chartered Property Casualty Underw./Insurance Institute of America 2nd ed. 2001). Although the citation in the latter text is to training material for bodily injury claims, the statement about identifying the need for expert consultation is of general application. When an adjuster improperly assumes the mantle of an expert, it is a factor to consider in evaluating whether the denial of a claim was bad faith. *E.g.*, Krajicek v. Automobile Club Inter-Ins. Exch., Inc., 2009 WL 3254904 at *8 (N.D. Okla. Oct. 7, 2009) ("notably, AAA did not hire an independent medical examiner to examine Joyce, and Brocato's [adjuster's] conclusions are therefore not supported by any medical opinion in the claim file at the time of her decision to deny coverage"); Wilson v. 21st Century Ins. Co., 171 P.3d 1082, 1087 (Cal. 2007) ("21st Century directs us to no medical report or opinion on the basis of which the claims examiner could reasonably have ignored or disbelieved Dr. Southern's conclusion that the changes in Wilson's cervical spine were probably caused by her recent trauma; as far as the record reveals, the claims examiner had no basis for his contrary conclusion that such a causative link was 'unlikely'. Nor is there any apparent medical basis for the claims examiner's assertion that Wilson has 'preexisting degenerative disk disease'. No such diagnosis appears in the medical report submitted to 21st Century, and we are directed to no evidence that the company's claims examiner had sufficient medical expertise to make such a diagnosis himself"); and Lambert v. State Farm Fire & Cas. Co., 568 F.Supp.2d 698, 712-13 (E.D. La. 2008) (State Farm successfully moved to exclude purported expert opinions of public adjuster who had represented insureds in submission of their claim to State Farm, on cause of structural damage to insured property, wind or water).

July 18, 2011
Page 11

Recorded statements are particularly useful when the adjuster perceives a conflict may exist about the facts of a claim or between witnesses, or between observations or recollections of witnesses and other sources of information. As noted, insurance policies contain tools which insurance companies typically use in the investigative process. The State Farm homeowners policy is typical. SECTION I – CONDITIONS, paragraph **2. Your Duties After Loss,** describe a number of responsibilities of the "you" in the policy, in this case Steven Hayes,[17] which arise once a loss has occurred. In addition, there is an implied duty imposed upon a claimant/insured to cooperate with the insurance company in the processing of a claim under a policy.[18] Cooperation extends to making witnesses and documents available upon reasonable request of the insurance company, and thereby enabling the adjuster to interview (and record the interview) of witnesses, and to review relevant documentation.

The insurance industry also recognizes it is mandatory as a matter of practice to communicate in a timely and clear manner any denial of a claim and the reasons for the denial to the claimant/insured. This is also a requirement imposed upon insurance companies by the OUCPA, 36 O.S. § 1250.7 (A) which specifically states the denial must be communicated in writing. The reason for the standard is to provide the claimant/insured with an adequate explanation for why his claim will not be paid. An inadequate explanation may reflect uncertainty on the adjuster's part as to the actual basis for the denial, and often leaves the claimant/insured without a sense of having been treated fairly. The written explanation also provides the adjuster's supervisor, insurance regulators and others with documentation upon which to evaluate the reasonableness of the denial of the claim. Given the purposes and requirements for communication of a denial of a claim, it is inappropriate for a claims person to simply quote clauses from the insurance policy and then state in a conclusory manner that the claim is denied. The communication of a denial of a claim should explain to the claimant/insured, a person almost always unsophisticated about insurance policies, why and how the clauses from the policy which are quoted in the letter (or the applicable law), apply to the facts as determined by the insurance company's investigation, and why this leads to the conclusion that the claim is not covered by the policy.

A major aspect of good claims handling is the training which claims personnel and their supervisors receive. The industry recognizes claims personnel must be trained to understand the policies under which claims handled by the particular claims representative are made, and the local laws of the jurisdiction which apply to the claims and which govern in no small part the interpretation of insurance policies. Knowledge of other good claims handling standards, including those I have mentioned, as well as the specific requirements of a state's unfair settlement practices act, such as the OUCPA, should also

---

[17] "You" and "your" are defined in the homeowners policy as "the 'named insured' shown in the **Declarations**". POLICY 15, DEFINITIONS. Steven Hayes is the named insured shown on the declarations of the policy in question.

[18] *See,* First Bank of Turley v. Fidelity & Dep. Ins. Co. of Md., 928 P.2d 298, 304 (Okla. 1996) which states: "once an insurer receives notice of a claim..., the insurer should evaluate the matter and make a reasonable investigation....An insured in turn has an obligation to cooperate with the insurer, which is...implied in law".

July 18, 2011
Page 12

be imparted in training. The OUCPA itself reinforces the industry's own standard by making it an unfair practice to "[f]ail[] to adopt and implement reasonable standards for prompt investigation of claims arising under its insurance policies or contracts". 36 O.S. § 1250.5(3). Only by adequate training can claims personnel learn the requirements for "prompt investigation".

## C. INTERNAL INSURANCE COMPANY STANDARDS.

Many insurance companies have their own standards for claims handling, some comprehensive, some not, and some very general and others quite specific. I have been furnished some (but surely not all) documentation prepared by State Farm concerning the handling of first party property coverage claims. The State Farm Operation Guide as well as the homeowners policy correctly state that any interpretation of policy language or the language itself must be considered in light of and conform to the applicable law. [POLICY 34, **SECTIONS I AND II – CONDITIONS** § 10. **Conformity to State Law**; *Claim Practices Fire – Water Damage Losses* § IV.C & E, HAYES 45 PROD and § IV, HAYES 51PROD; *Claim Interpretations – Losses Not Insured*, § III.A, HAYES 142PROD and 132PROD].

The section of the State Farm Operation Guide entitled *Claim Interpretations – First Party* states: "As always, each claim must be individually investigated, analyzed, and handled on its merits. Each claim evaluation must consider contract language, [and] the law in your jurisdiction". [HAYES 99PROD].[19] This language is included in a discussion of the *Suit Against Us* condition in the State Farm property coverages, such as paragraph 6 in **SECTION I – CONDITIONS** of the Hayes policy [POLICY 28], but the phrase "[a]s always" in the quoted material indicates the statement articulates a generally applicable standard.

Another claim practice of State Farm states: "The claim handler should provide a thorough explanation....This would also include explaining to the customer what information they will need to provide in order to obtain replacement costs benefits. [Betterment, Depreciation, and Actual Cash Value § 11, HAYES 57PROD.] Although this practice is included in the discussion of a particular issue – how loss is calculated for payment under the policy – it is of more general application.

The same section of the Operation Guide addresses a requirement to reevaluate a prior claim. Although the discussion is in the context of whether the suit limitation period bars suit on the claim (such as in the **Suit Against Us** condition of the Hayes policy), the discussion of reevaluation of a denied claim is of more general application within the general insurance industry. It states: "if we believe our original investigation failed to identify there was a loss caused by a covered peril or did not disclose the full extent of the

---

[19] This quotation is from the February 11, 2009 version of the document. I was also furnished a June 17, 2009 version which contains the same language. I was not furnished a version in effect prior to February 2009 so I assume none was produced and the February 2009 document articulates the vies of State Farm at the time of the losses which are the subject of Mr. Hayes' claims.

July 18, 2011
Page 13

damage, we should correct our factual mistake" [*Claim Interpretations – First Party*, HAYES 100PROD].

## X. STATE FARM VIOLATED STANDARDS APPLICABLE TO THE HANDLING OF MR. HAYES' CLAIMS WHICH CAUSED THE DENIAL OF HIS CLAIMS WITHOUT A REASONABLE BASIS.

State Farm, in my opinion, violated several standards established by law, the insurance industry, and State Farm itself, in the handling of the two claims it set up for damage to Steven Hayes' boat dock and, subsequently, for its sinking into Grand Lake.   In combination, these violations manifested either or both a lack of training of the adjusters and supervisors who handled the claims or a decision to disregard established claim practice.  Either way, the ultimate result was that State Farm did not give Mr. Hayes' interests the same consideration as it gave its own; it gave Mr. Hayes' interests less consideration and, as a result, improperly and unreasonably denied his claims.  This was bad faith.

### A. First Claim: Claim 36-AF609-597.

State Farm agent Marsha Corcoran reported a claim by Steven Hayes to State Farm on Monday, September 15, 2008, for what is reported in the State Farm Activity Log as "BOAT DOCK DAMAGED BY WIND" [SF 34] occurring on Saturday, September 13, 2008 [SF 30].  The dock was located on Grand Lake O' the Cherokees adjacent to land owned by Mr. Hayes in Langley, Oklahoma.  A house on this land was actually a two-story barn being re-renovated by a contractor Mr. Hayes had hired, Perry Kurth, at the time the claim was submitted [Hayes depo. 31-35].  Hayes was not present at the lake residence at the time the dock was damaged.  He received calls from one or several people who told him they had observed the damage occurring to the dock caused by wind, this being either the contractor, Kurth, or Tommy Akin, a neighbor.  Nora Black or Rodney Black, also neighbors, were the other persons who informed him they observed the dock as it was being damaged [Hayes depo. 42-43, 45-49].

### B. Significance of the Nature of the Property Coverage: Open Peril.

The claim was made under **Coverage A – Dwelling** of **SECTION I – COVERAGES** of the Hayes homeowners policy.  Coverage A in pertinent part states:

COVERAGE A – DWELLING

1. **Dwelling**.  We cover the dwelling used principally as a private residence on the **residence premises** shown in the **Declarations**.

   Dwelling includes:

   a.  structures attached to the dwelling;

July 18, 2011
Page 14

    b.  materials and supplies located on or adjacent to the **residence premises** for use in the construction, alteration or repair of the dwelling or other structures on the **residence premises**;

    c.  foundation, floor slap and footings supporting the dwelling; and

    d.  wall-to-wall carpeting attached to the dwelling.

***

[POLICY 17].

    Because the boat dock is a structure separated from the dwelling by clear space on the **residence premises**.[20]  The adjuster and thus State Farm correctly determined the boat dock was property insured under paragraph 2 of Coverage A, **Dwelling Extension** [Romanello depo. 48-49].  This is the industry perspective as well for structures which are not attached to the dwelling on the residence premises.  *See e.g.*, Richardson, *Homeowners Coverage Guide* at 14-15 (4th ed. 2011 The Nat'l Underw. Co.).

    Although State Farm utilizes its own proprietary homeowners forms, they are largely consistent with other standardized forms promulgated by organizations such as the Insurance Services Office (ISO) and American Association of Insurance Services (AAIS).  The State Farm homeowners form issued to Hayes, as well as similar forms promulgated by ISO and AAIS, provide very broad coverage at a higher premium than other homeowners coverages, as the cover page to the Hayes policy makes clear:

    This policy is one of the broadest forms available today and provide you with outstanding value for your insurance dollars....[POLICY 13].

    One of the indicators of the broad coverage that the cover page of the policy states it provides is in **SECTION I – LOSSES INSURED** for property insured under Coverage A such as the boat dock.  This section states:

    We [State Farm] insured or accidental physical loss to the property described in Coverage A except as provided in **SECTION I – LOSSES NOT INSURED** [POLICY 21].

    This language and its standardized counterparts create what is known as a "open peril" or "all risk" coverage, to be distinguished from "named peril" coverage.  *See e.g.*, Poulton v. State Farm Fire & Cas. Co., 675 N.W.2d 665, 671-72 (Neb. 2004); McDonald v. State Farm Fire & Cas. Co., 837 P.2d 1000, 1003 & n.5 (Wash. 1992); Garvey v. State Farm Fire & Cas. Co., 770 P.2d 704, 711 (Cal. 1989); Underwriters at Lloyds, London v. Cherokee Lab., Inc., 288 F.2d 95, 98 (10th Cir. 1961) (Okla. law); Broussard v. State Farm Fire & Cas. Co., 523 F.3d 618, 624 (5th Cir. 2008); Tuepker v. State Farm Fire & Cas. Co.,

---

[20] **Residence premises** is defined in relevant part in the policy as "the 1, 2, 3 or 4-family dwelling, other structures and grounds...where you reside and which is shown on the Declarations" [POLICY 16 ¶10].

July 18, 2011
Page 15

507 F.3d 346, 356 (5th Cir. 2007) (both Miss. Law), *disapproved on other gds. by* <u>Corban</u> <u>v. United Serv. Auto. Assoc.</u>, 20 So.3d 601, 618 (Miss. 2009); <u>Dickerson v. Lexington Ins.</u> <u>Co.</u>, 556 F.3d 290, 295 (5th Cir. 2009) (La. law); and <u>Codrin v. State Farm Fire & Cas. Co.</u>, 314 Fed.Appx. 671, 677 (5th Cir. 2009).

A well-known insurance encyclopedia summarizes the fundamental characteristics of "open peril" or "all risk" coverage and the significant advantage this coverage has for insureds in contrast with "named peril" coverage:

> "Named perils" or "specific perils" policies provide coverage only for the specific risks enumerated in the policy and exclude all other risks. "All-Risk" policies provide coverage for all risks unless the specific risk is excluded. Nevertheless, "All-Risk" policies only insure against a loss that arises from a fortuitous event that is unexpected and not probable. "All-Risk" policies exclude coverage for loss resulting from fraud by the insured or where the cause of the loss is specifically excluded. Although designated an "All-Risk" policy, such policies are not considered an "all-loss" policy because they contain various exclusions and do not in fact cover all losses.

> The purpose of an "All-Risk" policy is to insure losses when the cause of the loss is unknown or the specific risk was not explicitly contemplated by either party. This purpose is, in part, accomplished by a mechanism of burden-shifting as to which party bears the risk of an unexplained or uncontemplated loss. In an "All-Risk" policy, the insured has the initial burden to prove that the loss occurred. The burden then shifts to the insurer to prove that the cause of the loss is excluded by the policy. Under this burden-shifting mechanism, the insured does not need to prove the cause of the loss.

Russ & Segalla, COUCH ON INS. 3d § 101:7. This description of the burden of proof is recognized in the cases cited earlier and is the established law wherever open peril policies have been construed.

One of the major coverage guides extensively utilized in the insurance industry, and by one of the leading publishers of insurance materials, The National Underwriters Company, puts the advantages of "open peril" coverage this way:

> The named peril forms name exactly what is covered. The *open perils* forms, in contrast, state what is *not* covered. It is this distinction which gives the ISO [open perils forms] and AAIS [open perils forms] insured a coverage advantage. In the named peril forms, the burden of proof to prove there *is* coverage lies with the insured. But in the *open perils* forms, the burden lies with the insurer to prove there is *not* coverage based on the policy exclusions.

*Homeowners Coverage Guide, supra.*, at 87.

July 18, 2011
Page 16

These commentaries are fully in accord with Oklahoma law which imposes the burden of proof on the insured to establish a claim comes within the insuring agreement, *i.e.* there was an accidental direct physical loss to covered property, and on the insurer to prove an exclusion eliminates coverage for that accidental direct physical loss. *See e.g.,* Farmers & Marine Ins. Co. v. E.V. McCullum & Co., 207 P.2d 1094 (Okla. 1949) (Syl. 3); Redfearn v. American Central Ins. Co., 243 P. 929 (Syl.); Fidelity & Cas. Co. of NY v. First Bank of Fallis, 142 P. 312 (Okla. 1914) (Syl. 2); and Underwriters v. Cherokee Lab, 288 F.2d at 98 (applying Okla. law).

## C. The Insuring Agreement: Was the Claim for Accidental Direct Physical Loss?

Once presented with Hayes' initial claim, State Farm was required by the language of the policy as consistently construed by the courts to first determine whether the boat dock suffered an "accidental direct physical loss". The undefined word "loss" is accorded its ordinary meaning. "A 'loss' is incurred by an insured and typically, but not always, follows 'damage' to his or her property....[L]oss has been defined as '1. An act or instance of losing. 2. One that is lost. 3. Injury or damage caused by losing or being lost.' [citations omit.]. [L]oss occurs at that point in time when the insured suffers deprivation of, physical damage to, or destruction of the property insured." Corban, 20 So.3d at 612-13.

If there is an "accidental direct physical loss", it matters not what was the cause of the loss, unless State Farm in its investigation established that the loss was excluded. The activity log for the first claim contains no stated concern that the damage to the boat dock was not an "accidental direct physical loss". Indeed, there is no mention of this requirement anywhere in the claim file. The expressed concern in the file was whether, as reported, the damage was caused by wind or one of the descriptions of water in an exclusion (herein the Water Damage Exclusion). See SF 33, 9-16-08 Thompson entry; SF 10, 9-25-08 Dixon entry; SF 9, 10-3-08 Romanello entry and 10-14-08 Dixon entry; SF 7, 11-11-08 Romanello entry; and SF 3, 3-6-09 Tollett entry.

However, under the open peril insuring agreement, the question of whether the damage to the dock was caused by wind is simply not an issue. All accidental direct physical loss is covered unless State Farm demonstrates it is excluded. The claim file does not reflect State Farm ever disputed there was an accidental direct physical loss, and in fact there was one.

The word "accidental" and "accident" in Oklahoma insurance law refers to something which is unintended and unexpected. *See e.g.,* United States Fid. & Guar. Co. v. Briscoe, 239 P.2d 754, 756 (Okla. 1951); Penley v. Gulf Ins. Co., 414 P.2d 305, 308-09 (Okla. 1966) (both construing liability coverage for property damage "caused by accident"); Farmers Alliance Mut. Ins. Co. v. Salazar, 77 P.3d 1291, 1297 (10th Cir. 1996); Massachusetts Bay Ins. Co. v. Gordon, 708 F.Supp. 1232, 1234 (W.D. Okla. 1989) (both considering liability coverage for "bodily injury caused by an occurrence" where "occurrence" was defined in pertinent part as "an accident"); Kerr-McGee Corp. v. Admiral Ins. Co., 905 P.2d 760, 764 (Okla. 1995) (the word "accidental" within an exception to a pollution exclusion in liability coverage for a "sudden and accidental"

July 18, 2011
Page 17

discharge of pollutants means a discharge which is not intended or expected by the insured); Willard v. Kelley, 803 P.2d 1124, 1128-29 (Okla. 1999) (bodily injury "caused by accident" in auto uninsured motorist and medical payments coverage refers to injury which is not expected from the standpoint of the insured); Ply v. National Union Fire Ins. Co. of Pittsburgh, Pa., 81 P.3d 643, 647 n.6 (Okla. 2003) (whether bodily injury is "caused by accident" within uninsured motorist coverage is viewed from the perspective of the injured insured); and Cranfill v. Aetna Life Ins. Co., 49 P.3d 703, 707-08 (Okla. 2002) (where accidental death policy covering death as a result of a bodily injury suffered in an "accident", the death was covered if it was unexpected from the standpoint of the intoxicated insured who died while driving his vehicle).

The word "accidental" in the insuring agreement of the State Farm open peril coverage is also construed to refer to an unintended or unexpected loss. MRI Healthcare Center of Glendale, Inc. v. State Farm Gen. Ins. Co., 115 Cal.Rptr.3d 27, 29 (App. 2010) ("'Accidental' in an insurance policy typically means 'unintended and unexpected by the insured'"); Widdows v. State Farm Fla. Ins. Co., 920 So.2d 149, 150 n.1 (Fla. App. 2006) ("accident" is "[a]n event which takes place without one's foresight or expectation; an undesigned, sudden and unexpected event") (internal citations omitted), *quoting from* Braley v. American Home Assur. Co., 354 So.2d 904, 905 (Fla. App. 1978).

Similarly, the word "direct" in property insurance also has an established meaning, referring to the "proximate" or "efficient proximate cause" of a loss. *See e.g.,* Debuque Fire & Marine Ins. Co. v. Kaylor, 244 F.2d 162, 164 (10th Cir. 1957); Federal Ins. Co. v. Bock, 382 S.W.2d 305, 307 (Tex. Civ. App. 1964); Fisher v. Certain Interested Underw. at Lloyd's, 930 So.2d 756, 759 (Fla. App. 2006); Sansone v. Nationwide Mut. Fire Ins. Co., 770 A.2d 500, 503 (Conn. Super. 1999) *aff'd* 771 A.2d 243 (Conn. App. 2001); and Fred Myers, Inc. v. Central Mut. Ins. Co., 235 F.Supp. 540, 543 (D. Or. 1964).

A Florida court summarizes the prevailing view of these and other courts:

"A proper definition of 'direct loss' is loss proximately caused by the peril insured against, and the term 'proximate cause' as applied in insurance cases has essentially the same meaning as it does in negligence cases, except that in insurance cases, the element of foreseeableness or anticipation of the injury as the result of the peril insured against is not required....Thus, in a suit on a policy insuring for 'direct loss' caused by the named peril, a proper definition of proximate cause would be that cause which in a natural and continuous sequence unbroken by any new and intervening cause, produces the loss, and without which the loss would not have occurred".

Fisher, 930 So.2d at 759, *quoting from* Federal Ins. v. Bock, 382 S.W.2d at 307.

The requirement of a "direct loss" in the policies has an established judicial gloss recognized under the law of Oklahoma and many other jurisdictions. For example, in Shirey v. Tri-State Ins. Co., 274 P.2d 386 (Okla. 1954), the court quoted approvingly from Clouse v. St. Paul Fire & Marine Ins. Co., 40 N.W.2d 820, 823 (Neb. 1950) as follows:

July 18, 2011
Page 18

> In determining the cause of a loss for the purpose of fixing insurance liability, when evidence of concurring causes of the damage appears, the proximate cause to which the loss is to be attributed is the dominate, the efficient one that sets the other causes in operation; and causes which are incidental are not proximate, though they may be nearer in time and place to the loss."

274 P.2d at 388-390.

Thus, "[i]t is not necessarily the last link in the chain of events which constitutes proximate cause, but that which is the procuring, efficient, and predominate cause; that from which the effect might be expected to follow, without the concurrence of any foreseeing circumstances". Pennsylvania Fire Ins. Co. v. Sikes, 168 P.2d 1016 (Okla. 1946) (Syl. 2).

The Shirey and Sikes cases dealt with named peril coverages but subsequent Oklahoma cases have applied the doctrine of efficient proximate cause to open peril coverages. See, Duensing v. State Farm Fire & Cas. Co., 131 P.3d 127, 133, 137 (Okla. Civ. App. 2005) (whether accidental direct physical loss to a residence was subject to an exclusion for loss "which consists of, or is directly and immediately caused by...settling, cracking, shrinking...of pavements, patios, foundations, walls, floors, roofs or ceilings" was properly determined by the jury pursuant to the doctrine of efficient proximate cause); Kelly v. Farmers Ins. Co., Inc., 281 F.Supp.2d 1290, 1296-98 (W.D. Okla. 2003) (material fact question existed under the doctrine of efficient proximate cause concerning whether the efficient proximate cause of an accidental direct physical loss was excluded mold).

A loss is "physical" within the State Farm insuring agreement:

> when an item of tangible property has been "physically altered" by perils such as fire or water....That the loss needs to be "physical", given the ordinary meaning of the term, is 'widely held to exclude alleged losses that are intangible or incorporeal, and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.

MRI Healthcare v. State Farm, 115 Cal.Rptr.3d at 37, quoting COUCH ON INS. 3d § 148:46. This is the uniform standard for assessing whether a loss or damage is "direct" although, as usual, there are close cases on the facts. See e.g., Southern Hospitality, Inc. v. Zurich American Ins. Co., 393 F.3d 1137, 1141-42 (10th Cir. 2004) (applying Okla. law); Trinity Indust., Inc. v. Insurance Co. of N. Am., 916 F.2d 267, 270-71 (5th Cir. 1990); City of Burlington v. Ins. Co. of N. Am., 332 F.3d 38, 44 (2nd Cir. 2003); Port Auth. of NY v. Affiliated FM Ins. Co., 311 F.3d 226, 235-36 (3rd Cir. 2002); AFLAC Inc. v. Chubb & Sons, Inc., 581 S.E.2d 317, 319 (Ga. App. 2003); Wolstein v. Yorkshire Ins. Co., 985 P.2d 400, 407-08 (Wash. App. 1999); North Am. Shipbuilding, Inc. v. Southern Marine & Aviation Underw., Inc., 930 S.W.2d 829, 832-34 (Tex. App. 1991); and Pirie v. Federal Ins. Co., 696 N.E.2d 553, 555 (Mass. App. 1998).

July 18, 2011
Page 19

The boat dock was reported to have been damaged by high wind, a report corroborated by the one eye witness to whom a State Farm adjuster spoke [SF 12, 9-17-08 Basile entry]. There is no record of any State Farm adjuster asking Mr. Hayes if he knew of person who saw the damage occurring to the dock, even though he later identified them when asked by State Farm's lawyer in this case. See Hayes depo. 46-49. No record exists that State Farm's adjusters or their supervisor, Dixon, gave any consideration to the one eyewitness to whom an adjuster spoke, in evaluating the first claim.

Mr. Hayes was not present at the lake property when the dock was damaged. There is no evidence or suggestion in the claim file he intended or expected the dock to be damaged (or later for it to be sunk, the subject of the second claim) making the damage and the sinking "accidental". This conclusion would not be different if the waves on Grand Lake stirred up by the winds caused the damage. Mr. Hayes had no control of the wind or the waves so he could not have directed these natural forces, and there is no evidence he expected damage to or the sinking of his boat dock from waves on the lake; indeed, there is absolutely no evidence of investigation of this issue with respect to either claim submitted by Mr. Hayes.

Similarly, the damage to the boat dock which was the subject of the first claim was both direct and physical in the sense that the only evidence State Farm had showed wind set in motion the force which ultimately caused physical alteration of the dock. This was a direct physical loss necessitating structural repairs by Affordable Dock Service. The subject of the second claim, the sinking of the dock, as to be discussed later, was never investigated by State Farm. However, since the purpose of open peril coverage is to provide coverage for unexplained losses, or losses where causation cannot be determined, unless the cause was an excluded peril, the sinking of the dock was clearly a direct loss of it and, once the dock entered the lake waters, it was either totally lost or subject to the corrosive effects of the waters. In either event, the loss was physical.

The significance of these comments is, as the established authorities both in the industry and the law recognize, that both claims presented accidental direct physical losses within the insuring agreement of the Hayes homeowners property coverage, thereby placing the burden of proof squarely upon State Farm to demonstrate that the losses were caused by an excluded peril. In its investigation and evaluation of the Hayes claims, State Farm completely disregarded the fundamental nature of the open peril coverage it sold to Mr. Hayes, providing "one of the broadest" coverages available. The claim file reflects that, instead of focusing on whether an excluded peril such as those contained within the Water Damage Exclusion applied, State Farm focused on proving wind was not the cause of the damage, or that Mr. Hayes violated the YOUR DUTIES AFTER LOSS condition.

It is immaterial whether wind was the cause of the damage since there clearly was an accidental direct physical loss, a conclusion uncontested by State Farm in the course of its investigation or in its answer in this case. Since State Farm ultimately did not deny the first claim on the basis of the Water Damage Exclusion, and has not asserted that exclusion as an affirmative defense in this case, the only reasonable conclusion that State Farm

July 18, 2011
Page 20

should have reached with regard to the Hayes claims is that they were payable as accidental direct physical losses to Mr. Hayes' boat dock.

By failing to acknowledge the fundamental nature of the coverage sold to Mr. Hayes, the State Farm adjusters and supervisors violated the clear requirements of the policy, as established by the case law and insurance industry knowledge, without any justification. Moreover, even if the Water Damage Exclusion would have provided "a legitimate defense to a breach of contract claim", since State Farm "did not actually rely on that defense to deny payment under the policy," State Farm cannot now interject the exclusion as a defense. Vining v. Enterprise Fin. Grp., Inc., 148 F.3d 1206, 1214 (10th Cir. 1998); Haberman v. The Hartford Ins. Grp., 443 F.3d 1267, 1270 (10th Cir. 2006) (both Oklahoma law).

### D. State Farm Conducted An Inadequate Investigation Into Whether the Water Damage Exclusion Applied.

The only substantive ground identified by State Farm in the claim file to deny the first claim is the Water Damage Exclusion 2.c which states:

2. We do not insure under any coverage for loss which would not have occurred in the absence of one or more of the following excluded events. We do not insure for such loss regardless of: (a) the cause of the excluded event; or (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss; or (d) whether the event occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination f these:

***

c. **Water Damage**, meaning:

    (1) flood, surface water, waves, tidal water, tsunami, seiche, overflow of a body of water, or spray from any of these, all whether driven by wind or not;

    (2) water or sewage from outside the **residence premises** plumbing system that enters through sewers or drains, or water which enters into and overflows from within a sump pump, sump pump well, or any other system designed to remove subsurface water which is drained from the foundation area; or

    (3) water below the surface of the ground, including water which exerts pressure on, or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

However, we do insure for any [illegible] loss by fire, explosion or theft resulting from water damage, provided the resulting loss is itself a Loss Insured.

July 18, 2011
Page 21

[POLICY 24-25, **SECTION I, LOSSES NOT INSURED** ¶2.c].

The purpose of the introductory paragraph 2, called a "lead-in clause" or "anti-concurrent cause" (ACC) clause, is to contractually eliminate the judicially developed "efficient proximate cause" doctrine used by Oklahoma and other courts to decide if the cause of a property loss is covered or excluded. *See e.g.,* Duensing v. State Farm, 131 P.3d at 134 (Oklahoma Court of Civil Appeals applied the ACC clause in paragraph 2 of the State Farm homeowners policy to another paragraph 2 exclusion, Earth Movement). As applied to the Water Damage Exclusion, the ACC clause more often has been construed as follows:

> any damage caused *exclusively* by a nonexcluded peril or event such as wind, not concurrently or sequentially with water damage, is excluded [citation omitted]. Thus, the ACC Clause in combination with the Water Damage Exclusion clearly provides that indivisible damage caused by both excluded perils and covered perils or other causes is not covered. However, as State Farm conceded..., the ACC Clause by its terms applies only to "any loss which would not have occurred in the absence of the one or more below listed excluded events", and thus, for example, if wind blows off the roof of the house, the loss of the roof is not excluded merely because a *subsequent* storm surge completely destroys the entire remainder of the structure; such roof loss *did* occur in the absence of any listed excluded peril.

Tuepker v. State Farm, 507 F.3d at 354. The same view is generally taken of the standardized ISO and AAIS ACC Clauses. See e.g., *Homeowners Coverage Guide* at 99-100, 102-106 (stating on page 106 "when...wind-driven water (a hurricane) causes 'such loss' [the type of loss excluded], it is excluded, but when wind causes a loss separately from the water, that loss is covered").

Encyclopedic commentators concur:

[A]s the term concurrent causation is understood in legal analysis, the two chief agents of Katrina damage, wind and flood – the first covered by policies, the second excluded – are not in fact concurring in most cases because they caused different damages and different losses.

Rossmiller, *Interpretation and Enforcement of Anti-Concurrent Policy Language in Hurricane Katrina Cases and Beyond*, in *New Appleman on Insurance: Current Critical Issues in Insurance Law* at 44, quoted approvingly in Maxus Realty Trust, Inc. v. RSUI Indem. Co., 2007 WL 4468697 at *2 (W.D. Mo. Dec. 17, 2007) mt. to clarify and for recon. gtd. in pt., den'd in pt., 2008 WL 2098084 (W.D. Mo. May 16, 2008).

In Duensing v. State Farm the Oklahoma Court of Civil Appeals took much the same view:

The only fair construction of that paragraph [2] is that when more than one cause is involved in a loss which includes one of the excluded events named under the lead-

July 18, 2011
Page 22

in clause, in this case, earth movement, there is no coverage regardless of whether
the causes acted concurrently or in any sequence with the excluded event.

131 P.3d at 134.

By its own terms, the ACC Clause 2 does not apply if an accidental direct physical loss
is shown to have one or more nonexcluded causes or if damage is proven to have resulted
from a nonexcluded cause, and other damage sequentially is the result of an excluded
clause. Consequently, once an insured proves the insured property was damaged by wind,
where wind is a nonexcluded peril, the burden shifts to the insurance company "to prove
how much of the damage was caused by [the water perils in the water damage exclusion]
and was thus excluded from coverage under the policy". Dickerson v. Lexington Ins. Co.,
556 F.3d at 295 (La. law). *Accord:* Corban, 20 So.3d at 616-619; Dickinson v. Nationwide
Mut. Fire Ins. Co., 2008 WL 941783 at *5-6 (S.D. Miss. April 4, 2008) and 2008 WL
1913957 at *2 (S.D. Miss. April 25, 2008).

State Farm's investigation of the Hayes' claims never identified any credible evidence
that any of the perils identified in the Water Damage Exclusion, alone or aided by wind,
caused the initial damage to the dock or later caused it to sink. A State Farm adjuster
inspected the dock in connection with the first claim, and opined he could not see how
wind could cause the damage [SF 11, 9-22-08 Basile entry]. There is nothing in the claim
file to indicate the adjuster's qualifications to render this opinion. State Farm never hired a
qualified expert in engineering, construction, hydrology, meteorology, or any other subject
matter who might be qualified to opine on whether water from Grand Lake caused the
damage to the dock which was repaired, or subsequently caused it to sink.

On the other hand, the same adjuster was told by an eyewitness to the damaging event
that wind caused the damage to the dock:

Called the contractor and he advised that he was out there on the DOL [date of
loss] and that wind was wracking the dock and it was coming apart. The advised
there were no waves but that wind was very high. He said dock is 2 stories and that
lower deck is 3" of concrete over steel framing. He advised upper deck is steel
sheet decking over sub frame and wood decking on top of that. Welds were
breaking on steel frame but wind di[d] not remove decking. He said wind was
tearing the dock apart. [SF 12, 9-17-08 Basile entry].

The log does not identify the "contractor" with whom the adjuster was speaking. It
could have been the contractor doing the repairs on the dock from Affordable Dock
Service, or it could have been, as suggested by Mr. Hayes in his deposition, Perry Kurth,
the contractor renovating the barn on the property adjacent to the dock as a house. The
adjuster also did not record his interview with the "contractor", notwithstanding he is the
only person identified in the claim file as an eyewitness to the events which allegedly
caused damage to the dock. This was a violation of industry standards regarding proper
documentation and use of investigative tools which are available to State Farm adjusters.

State Farm was also presented with an estimate to repair the dock by Affordable Dock Service dated September 15, 2008 which states: "Complete Dock Damaged By Wind" [SF 42]. Affordable Dock subsequently submitted an invoice to Mr. Hayes who in turn provided it to State Farm for repairs of the dock on September 16, 2008 which also states: "Repair Boat Dock Damage from wind" [SF 41].

On September 22, 2008 the adjuster who talked to the "contractor", Basile, inspected the dock, noting the repairs were complete. Basile speculates there is no evidence of wood damage, without any qualifications to render that opinion as stated above. But critically, this note reiterates that the "[r]epair person has stated he was present on DOL and there were very high winds but no waves and that dock was coming apart and on the verge of sinking when he was there" [SF 11, 9-22-08 Basile entry]. Notwithstanding the eyewitness testimony, Basile concluded, again without any evidence of any qualifications to do so, that "I do not understand how wind could cause damage to this very heavily constructed steel and concrete structure but not damage wood fence or comp shingles on house that is in very close proximity". *Id.*

Publicly available data from the National Climatic Data Center would have disclosed to State Farm, had it bothered to check, that Hurricane Ike came ashore in southeast Texas late on the night of September 12, 2008 and in the early morning of September 13, 2008, and proceeded northward on the 13th and the 14th, bringing with it tropical force winds into eastern Oklahoma and western Arkansas.

The information State Farm had and could have acquired during its investigation and evaluation of the first claim establish the dock was damaged by high winds, and not from water, alone or in combination with high winds. The only excluded water peril State Farm mentions in the log entries is "waves". Since the word is not defined in the policy, its ordinary meaning is applied.[21] Thus, in a Water Damage Exclusion "wave" has been defined as it is in the dictionary as "'a moving ridge or swell on the surface of a liquid (as of the sea).' Significantly, unlike a 'flood,' a 'wave' does not require movement of water into an area not typically covered by it." Transcontinental Ins. Co. v. RBMW, Inc., 551 S.E.2d 313, 319 (Va. 2001). The ordinary meaning of "wave" also does not distinguish between natural and artificial forces which cause it (e.g., wind or the wake or wash of a motor boat either could cause a "wave"). O'Meara v. American States Ins. Co., 268 N.E.2d 109, 111-12 (Ind. App. 1971).

The only real evidence State Farm had was the eyewitness who told State Farm, as did the repairman in his estimate and invoices, that wind and not waves damaged the dock. Other eyewitnesses identified by Mr. Hayes in his deposition when asked by State Farm's counsel but never interviewed by State Farm, told Mr. Hayes the same thing. Such eyewitness testimony in cases where the disputed issue is whether damage to insured property was caused by wind or waves is highly probative evidence of the cause of loss. *See e.g.,* Bossier v. State Farm Fire & Cas. Co., 2009 WL 3049282 at *1 (S.D. Miss. Sept. 17, 2009) (court ruled a jury question existed concerning whether State Farm acted in bad

---

[21] 15 O.S. § 157; Kerr-McGee v. Admiral Ins., 905 P.2d at 963-964.

July 18, 2011
Page 24

faith by denying Hurricane Katrina claim, based in part on State Farm's failure to interview a neighbor of the insured who remained in his home during the hurricane); Hardware Dealers Mut. Fire Ins. Co. v. Smart, 293 F.2d 558, 560 (10th Cir. 1961); Dean v. Quincy Mut. Ins. Co., 392 S.W.2d 897, 900-902 (Tex. Civ. App. 1965) (numerous neighbors of insured testified to high winds in Hurricane Carla to establish percentage of damage to insured property which was caused alone by wind, a covered peril); and McDonald v. New York Central Mut. Fire Ins. Co., 380 S.W.2d 545, 546 (Tex. 1964) (husband and wife neighbors of insureds were eyewitnesses to the winds accompanying Hurricane Carla). The federal government's own weather data tends to corroborate the eyewitnesses.

The only reference to waves as the cause of the damage was the speculation of the adjuster who inspected the dock after it was repaired. A decision based on such unqualified speculation would itself evidence bad faith. For example, in Fonte v. Audubon Ins. Co., 8 So.3d 161 (Miss. 2009), a Hurricane Katrina claim, the court reversed summary judgment for an insurance company administering claims for a state windstorm association under a policy insuring against loss caused by the specific peril of windstorm. There was evidence that the adjuster handling the claim had been told "'that it was assumed and believed that storm surge, or flood, created a significant part of the total damage" to properties "along U.S. 90 in the Gulfport/Biloxi/Pass Christian area", and that the adjuster "had no training in meteorology, structural engineering, civil engineering, or other expertise for differentiating between wind and water damage", and that the insurer "also failed to provide Jay [the adjuster] with standard meteorological data, a consulting meteorologist, or any other consulting expert in adjusting the Fontes' claim." Id. at 167. The Mississippi Supreme Court concluded:

> The Fontes' adjuster, John Jay, made an arbitrary determination that he was "going to adjust this claim based on the top half of the home being damaged by wind," and he thinks it would be correct to say "that this estimate did not take into account possible damage to the lower portions of the home that would have been caused by the loss of the roof or breaking of the windows on the upper portion of the home from the ingress of rain water or wind-driven water." Jay's determination was made with limited expertise, without meteorological data, without a consulting expert, and based on the instruction not to pay one hundred percent of the Fontes' policy limits. Whether an arguable or legitimate basis for denying the Fontes' claim existed for Audubon's decision not to pay the policy limits must be examined by a jury to determine if there existed a gross and reckless disregard for the Fontes' rights. Id.

A similar case in which the court denied summary judgment on a bad faith claim against State Farm arising out of denial of a Hurricane Katrina claim, is Spansel v. State Farm Fire & Cas. Co., 683 F.Supp.2d 444 (S.D. Miss. 2010). The relevant evidence included the fact that "State Farm requested an engineer to determine the cause of loss" and, "[t]hree says later, State Farm again wrote the Spansels that it was continuing to try and determine what portion of the loss was caused by wind." Id. at 448. However, sixteen days after State Farm requested the engineer to determine the cause of loss, "State Farm instructed the engineer, 'Please cancel this assignment....If you have already inspected this

July 18, 2011
Page 25

loss, do not write the report. Send your investigation material with your bill'....*Id.*  No investigation material turned up in the file. On this same date, the adjuster recorded that he sent the Spansels a letter of denial 'based upon flood being cause of loss and not an insured event. .File ready to close without payment.'" *Id.* Subsequently, the adjuster's supervisor asked him, "'Where are photos and logs of your investigation for this claim? We need proximity to water, etc. per investigation of wind and water protocols.' [record citation omit.] State Farm's wind and water protocol required an investigation be documented in the file to determine the wind versus water causation." *Id.* at 448-49. The adjuster responded to the supervisor by stating "he inspected the property and took pictures for the first time on October 22, three days after the engineer had been instructed to cancel his assignment and a day after he informed the insureds the claim was being denied from the basis that the excluded flood peril caused the loss." *ID.* at 449.

The district court concluded:

> This evidence, viewed in the light most favorable to the Spansels, tends to show their claim was denied on October 19, before an adjuster had set foot on their property, reviewed photographs of the loss, or received any data other than the property's location along Bay St. Louis. State Farm management affirmed this denial based solely on the property's proximity to the Gulf of Mexico. This creates question for the jury as to whether State Farm lacked a legitimate arguable reason for denial of when coverage under the homeowner's policy. *Id.* 449.

The court then quoted from <u>Fonte</u>'s observations that the adjuster had no training in any specialties which might provide expertise for differentiating between wind and water damage, and for not consulting an expert (the expert's assignment had been cancelled in <u>Spansel</u>). *Id.* Another court granted State Farm's motion to exclude a public adjuster's opinion as to whether wind or water caused damage to insured property in Hurricane Katrina, for the same lack of qualifications the foregoing cases found of insurer adjuster. <u>Lambert v. State Farm Fire & Cas. Co.</u>, 568 F.Supp.2d 698, 712-713 (E.D. La. 2008).

In sum, State Farm never had a legitimate basis factually or legally to deny the first claim on the ground that "waves" caused the damage to the dock, alone or in combination with wind. Because the Hayes policy is open peril, and it is uncontested and proven the dock sustained an accidental direct physical loss, State Farm should have paid for the repairs made to the dock by Affordable Dock Service. The failure to do so was unreasonable, as it was based on an inadequate investigation relying upon unqualified speculation of an adjuster while disregarding direct eyewitness testimony concerning the cause of the damage, and a misinterpretation of the relevant policy language. This refusal to pay was also in violation of industry standards requiring a thorough, unbiased investigation, giving the insured's interest at least equal consideration with the insurer's, and requiring adherence to applicable law and policy language, and further requiring an insurer to consult with experts to address issues which adjusters are not qualified to evaluate. The failure of the adjusters and their supervisor to apply clear law construing open peril policies and the ACC Clause to the Water Damage Exclusion also violated State

July 18, 2011
Page 26

Farm's own Operation Guide which requires claims personnel to adhere to applicable law in the interpretation of the open peril property coverages.

### E. Other Exclusions State Farm Wanted to Apply to the First Claim.

A very curious thing about the first claim is that the claim file is replete with references to waves as the cause of the damage to the dock and not wind but, ultimately, State Farm did not advise Mr. Hayes it was denying his first claim on the basis of the Water Damage Exclusion. An entry by the supervisor of the adjusters handling the claim, Dixon, indicates the focus was on the Water Damage Exclusion as well as other exclusions identified in the note, for which absolutely no reliable evidence had been developed. The log note states:

From my review of the photos and investigation, I note the following:

1) I do not see any damages I can attribute to windstorm to the dock, neighboring structures, fences or trees.

2) Wind speeds were checked for this area and DOL. Maximum wind speeds were @35mph (insufficient to cause damage to this structure).

3) Structure is top heavy and may have been constructed incorrectly (there are no cross-braces to prevent lateral motion of the upper deck, especially from wave action below).

4) There are no vertical components to the dock which would capture the wind and/or act as a sail for the wind to pull the structure sideways.

5) The insured failed to adhere to a CONDITION of the policy allowing State Farm to inspect prior to completing repairs (Your Duties).

6) There was no unnecessary, lengthy delay from the date the claim was reported to the inspection date (the claim was inspected 7 days after it was reported). According to the contractor, the dock was stabilized.
*****
Based upon the items above, the policy excludes coverage. Reference "Your Duties After Loss", as well as exclusions LNI [Losses Not Insured] 1.c, g., h. as well as LNI 3.b. (1-4). [SF 10, 9-22-08 Dixon entry].

Like the adjuster who inspected the dock after repairs were completed, there is no indication in the claim file of the qualifications of the supervisor Dixon to render opinions differentiating causation between wind and waves with regard to a structure like the Hayes boat dock. Nor is there any evidence. Notably missing from his factors noted is the federal government's climate data which I mentioned earlier showing tropical force winds in eastern Oklahoma over the weekend when the damage to the dock was reported to Mr. Hayes to have occurred, as a consequence of Hurricane Ike making land in southeast Texas. Also completely disregarded in this note by the supervisor is the eyewitness

July 18, 2011
Page 27

statement given to adjuster Basile, stating the dock was damaged by winds observed by the eyewitness. And, of course, this note does not take into account other eyewitnesses identified in Mr. Hayes' deposition since, unlike State Farm's lawyer in this case, State Farm's adjusters never bothered to investigate to see if there were other eyewitnesses.

The exclusions which Dixon refers to and instructs his adjuster, Kathy Romanello, to "reference" include **1.c** for loss caused by "freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a...dock". See POLICY 23. As State Farm's Operation Guide acknowledges, the paragraph 1 exclusions in **SECTION I – LOSSES NOT INSURED**, which include exclusion **1.c**, are not subject to an ACC Clause; rather, application of the paragraph 1 exclusions is determined according to traditional efficient proximate cause principles, as the Oklahoma Court of Civil Appeals held in Duensing v. State Farm, 131 P.3d at 133-34 (holding exclusion 1.1 in the State Farm homeowners policy, the "settling" exclusion, was subject to Oklahoma's efficient proximate cause doctrine). See *Claim Interpretations – Losses Not Insured*, HAYES 142PROD and 134PROD.

Nothing in the supervisor's notes indicates that he recognized a significant difference in the scope between the paragraph 1 exclusions he cites, and the Water Damage Exclusion in paragraph 2 which he also cites, as well as a paragraph 3 exclusion he cites (the significance of which will be discussed *infra.*). Consequently, even if State Farm had developed evidence that any excluded peril played some causal role in the loss to the dock which was the subject of the first claim, the supervisor seems not to have known the proper analysis to apply in determining whether the exclusions eliminate coverage. This is most unreasonable given the explanation for the differences in scope of paragraph 1, 2 and 3 exclusions in State Farm's Operation Guide, the fact that Oklahoma law also recognizes these differences, and that State Farm has heavily litigated the applicability of exclusions under all three paragraphs.

Compounding this problem, the claim file contains absolutely no evidence that the "weight" of water, the only potentially applicable part of exclusion **1.c**, caused the damage to the dock. A "weight of water or ice" exclusion (or the corresponding coverage for the very same perils, usually for personal property) recognizes that it is the heaviness (weight) of water or ice which generates pressure on a structure which must cause the loss, and not other factors associated with the water or the ice, such as the speed with which water might hit a structure. *E.g.,* Wurst v. State Farm Fire & Cas. Co., 431 F.Supp.2d 501, 506 (D. N.J. 2006).

Exclusion **1.g** cited by Dixon is for loss caused by "wear, tear, marring, scratching, deterioration, inherent vice, latent defect, or mechanical breakdown". POLICY 24. As the quotation indicates this exclusion is actually a collection of excluded perils. Most of the perils implicate a gradual process and others, like latent defect and inherent vice, are usually related to the construction or composition of property. In any event, the claim file contains no description of any evidence which would discharge State Farm's burden to prove any of these excluded perils caused the damage to the dock (or, for that matter, the subsequent sinking of the dock which is the subject of the second claim).

July 18, 2011
Page 28

Perhaps this omission is because the supervisor does not understand the nature of the perils. Damage caused by "wear" or "tear" is simply damage which simply results from the normal usage of property over time. *See e.g.,* Cyclops Corp. v. Home Ins. Co., 352 F.Supp. 931, 936 (W.D. Pa. 1973), defining "wear and tear" in a property exclusion by reference to the dictionary as "'[t]he loss or injury to which something is subject by or in the course of use; *esp.:* normal depreciation.", and further stating that "we are convinced that the words 'wear and tear' mean simply and solely that ordinary and natural deterioration or abrasion which an object experiences by its expected contacts between its component parts and outside objects during the period of its natural life expectancy." *See also,* Meridian Leasing, Inc. v. Associated Aviation Underw., Inc., 409 F.3d 342, 350-52 (6th Cir. 2005) (applying Cal. Law).

"Deterioration" refers to "all slow moving disintegration or erosion of the property because of external forces". Brodkin v. State Farm Fire & Cas. Co., 265 Cal.Rptr. 710, 714 (App. 1989). The "deterioration" peril makes no distinction between "normal" deterioration and "abnormal" deterioration. Murray v. State Farm Fire & Cas. Co., 268 Cal.Rptr. 33, 35-36 (App. 1990).

State Farm's focus in the investigation was on whether a sudden event, wind or waves, caused damage to the dock. The investigation developed no evidence the dock was damaged over time by "wear, tear,...deterioration".

The ordinary definition of "defect" is an "imperfection or shortcoming". BLACK'S LAW DICTIONARY 4297 (7th ed. 1997). A "latent defect" is generally defined in Oklahoma as a defect "not readily discoverable". John W. Simmons Trucking Co. v. Briscoe, 373 P.2d 49 (Okla. 1962) (Syl. 4). Consistent with these definitions a "latent defect" exclusion has been held to apply "where defective construction, design, or fabrication of property results in the property's failure or deterioration before its normal life, and the defect is not apparent upon reasonable inspection but only after a post-failure examination by an expert....". Acme Galvanizing Co. v. Fireman's Fund Ins. Co., 270 Cal.Rptr. 405, 410 (App. 1990). *Accord:* Winans v. State Farm Fire & Cas. Co., 968 F.2d 884, 887 (9th Cir. 1992) (Cal. law); Derenzo v. State Farm Mut. Ins. Co., 533 N.Y.S.2d 195, 197 (S.Ct. 1988); Chubb Grp. of Ins. Cos. v. Guyuron, 1995 WL 739618 at *4 (Ohio App. Dec. 14, 1995) (collecting other cases); Board of Edu. Etc. v. International Ins. Co., 684 N.E.2d 978, 983 (Ill. App. 1997) *rev. den'd* 689 N.E.2d 1137 (Ill. 1997). The exclusion does not apply if the defect is readily discoverable. City of Burlington v. Hartford Steam Boiler Inspection & Ins. Co., 190 F.Supp.2d 663, 668 (D. Vt. 2002) *aff'd* 346 F.3d 70 (2nd Cir. 2003) (collecting other cases); Wright v. Safeco Ins. Co., 109 P.3d 1, 9 (Wash. App. 2004); Neri v. Nationwide Mut. Fire Ins. Co., 719 A.2d 1150, 1154 (R.I. 1998); COUCH ON INS. 3d § 153:77; and *Homeowner's Coverage Guide* at 93-94.

State Farm identified no evidence of any defect in the design or construction of the dock which caused the damage repaired by Affordable Dock Service, nor did State Farm develop any evidence that the cause of the damage was some "defect" which was not readily discoverable. The supervisor's log note speculated on deficiencies in the

July 18, 2011
Page 29

construction but no qualified expert on design or construction of boat docks was consulted by State Farm. In any event, the supervisor failed to acknowledge in his note that a defect is "latent" within the meaning of the exclusion only if not readily discoverable. The supervisor drew his conclusion from a review of photographs of the dock. Construction defects which a nonexpert claims to see on photos is readily discoverable and thus it isn't latent.

An "inherent vice" in the exclusion has been defined as follows:

> An inherent vice is defined by various courts as "'any existing defects, diseases, decay, or the inherent nature of the commodity which cause it to deteriorate with a lapse of time'". It is also defined "as a cause of loss not covered by the policy, does not relate to an extraneous cause but to a loss entirely from internal decomposition or some quality which brings about its own injury or destruction. The vice must be inherent in the property for which recovery is sought.

Port of Seattle v. Lexington Ins. Co., 48 P.3d 334, 338-39 (Wash. App. 2002). *See e.g.,* Aetna Cas. & Sur. Co. v. Yates, 344 F.2d 939, 941 (5th Cir. 1965); Employers Cas. Co. v. Holm, 393 S.W.2d 363, 367 (Tex. Civ. App. 1965); Archer-Daniels-Midland Co. v. Phoenix Assur. Co., 975 F.Supp. 1129, 1136 (S.D. Ill. 1997). The analysis of whether an inherent vice exclusion applies "focuses on whether the insured's problems or loss was caused by an internal or external factor or defect; if caused by an *internal* defect, the problem should be excluded from coverage as an inherent vice". State v. Allendale Mut. Ins. Co., 154 P.3d 1233, 1236 (Mont. 2007).

State Farm developed no evidence of some internal problem in the makeup of the dock that caused the damage which Affordable Dock Service repaired. State Farm's focus was on whether an external forces, winds or waves, or both, caused the damage. Nor did State Farm or the supervisor Dixon have any basis whatsoever to believe the damage was caused by the last excluded peril in exclusion **1.g** – "mechanical breakdown".

The ordinary definition of "mechanical breakdown" utilized in this exclusion is "a failure in the working mechanism if the machinery – a functional defect in the moving parts of the equipment which causes the latter to cease functioning or to function improperly". National Investors Fire & Cas. Co. v. Preddy, 451 S.W.2d 457, 458 (Ark. 1970). *See e.g.,* Connie's Construction Co., Inc. v. Continental Western Ins. Co., 227 N.W.2d 204, 207 (Iowa 1975) and American Graphics, Inc. v. Travelers Indem. Co., 17 Fed.Appx. 787, 791 (10th Cir. 2001). However, "mechanical breakdown" exclusions only apply if the mechanical breakdown causes the loss, not if the mechanical breakdown is the result or effect of some other peril acting on the machinery. Associated Aviation Underw. v. George Koch Sons, Inc., 712 N.E.2d 1071, 1076 (Ind. App. 1999) *transf. den'd* 726 N.E.2d 312 (Ind. 1999); Sackett v. Farmers Ins. Exch., 47 Cal.Rptr. 350, 351 (App. 1965); Connie's Constr., 227 N.W.2d at 207; and Blackwell v. Allstate Ins. Co., 643 S.W.2d 447, 448 (Tex. App. 1982).

July 18, 2011
Page 30

There is no evidence the dock includes any moving parts which could "breakdown", and there is no evidence, if such parts existed, that the breakdown of mechanical parts caused the damage to the dock which Affordable Dock Service repaired.

Exclusion 1.**h** which Dixon said should be referenced in denying Mr. Hayes' first claim is for loss caused by "corrosion, electrolysis or rust", perils which generally act gradually upon property. "As a general rule, '[e]xclusion for damages caused by corrosion precludes [sic] recovery for any damage caused to property because of contact with any corrosive agent. Most jurisdictions hold that an exclusion for damages caused by corrosion precludes recovery for damages caused by corrosion regardless of what caused the corrosion or how suddenly the corrosion occurred." Travco Ins. Co. v. Ward, 715 F.Supp.2d 699, 714 (E.D. Va. 2010), *quoting from* COUCH ON INS. 3d § 153.80 (int. qt. mks. omit.). *Accord:* Bishop v. Alfa Mut. Ins. Co., ___ F.Supp.2d ___, 2011 WL 2457867 at *7 (S.D. Miss. June 16, 2011); Kay v. United Pacific Ins. Co., 902 F.Supp. 656, 658 (D. Md. 1995); and Bettigole v. American Employers Ins. Co., 567 N.E.2d 1259, 1262 (Mass. App. 1991).

"Electrolysis" is "the passage of an electric current through an electrolyte [which is "a conducting medium in which the flow of current is accompanied by the movement of matter in the form of ions"] with subsequent migration of positively or negatively charged ions to the negative and positive electrodes". *The Random House Dictionary of the English Language* (2nd ed. unabrid. 1983) at 628. "Rust" is a "film or coating on metal caused by oxidation". *Id.* at 685. A rust exclusion applies, for example, where a corrugated metal roof rusted to the point that a leak developed in the roof, water then entered through the leak into the interior of a cattle hide tanning factory, and the court held the cost to repair the roof was excluded because "the hole in the roof was caused by rust and deterioration". Twin City Hide v. Transamerica Ins. Co., 358 N.W.2d 90, 92 (Minn. App. 2004).

Like Dixon's reference to the exclusions for "wear", "tear", and "deterioration", there is no evidence described in his notes or in the claim file as a whole to prove corrosion, electrolysis or rust caused the damage to the dock which Affordable Dock Service repaired.

The last exclusion Dixon instructs the adjuster to reference, **3.b**, commonly referred to as a "faulty workmanship" exclusion states:

3. We do not insure under any coverage for any loss consisting of one or more of the items below. Further, we do not insure for loss described in paragraphs 1. and 2. immediately above regardless of whether one or more of the following: (a) directly or indirectly cause, contribute to or aggravate the loss; or (b) occur before, at the same time, or after the loss or any other cause of the loss:

***

b. defect, weakness, inadequacy, fault or unsoundness in:

(1) planning, zoning, development, surveying, siting;

July 18, 2011
Page 31

> (2) design, specifications, workmanship, construction, grading, compaction;
>
> (3) materials used in construction or repair; or
>
> (4) maintenance;
>
> Of any property (including land, structures, or improvements of any kind) whether on or off the **residence premises**; or
>
> ***
>
> However, we do insure for any resulting loss from items a., b. and c. unless the resulting loss itself is a Loss Not Insured by this Section. [POLICY 25].

As stated earlier, Dixon speculated the dock "**may** have been constructed incorrectly". "May" surely is not the basis for a conclusion that State Farm discharged its burden to prove the damage to the dock consisted of some "defect, weakness, inadequacy, fault or unsoundness in" the construction of the dock or the materials used in its construction. State Farm did not follow up on Dixon's speculation by hiring an expert to examine the pre-loss repair photos or the dock in its post-repair condition to determine if evidence existed the dock had been incorrectly constructed.

Moreover, Dixon's note indicates an unfamiliarity with the actual limited language of the paragraph 3 exclusions. The introductory paragraph states there is not coverage "for any loss **consisting** of one or more of the items below" (emp. add.). State Farm's Operation Guide indicates the paragraph 3 exclusions are much more limited than the paragraph 1 and 2 exclusions. It indicates, for example, that only the defective construction is excluded, and thus coverage for any loss which follows upon the defective construction must be analyzed without regard to the excluded defective construction as a cause. See *Claim Interpretations – Losses Not Insured* § III.3, HAYES 136PROD & 144PROD. Under this interpretation, if the dock was defectively constructed, then all that is excluded from coverage is that part of the dock which was incorrectly constructed, unless some paragraphs 1 or 2 exclusion then applies. Dixon's note completely ignores this critical limitation on paragraph 3 exclusions.

### F.  The Actual Grounds for Denial of the First Claim.

Although supervisor Dixon instructed the adjuster assigned to the first claim, Romanello, to deny the claim, citing all of the clauses in the policy to reference, State Farm's actual denial for the claim was not based upon the Water Damage Exclusion or any other exclusion. In addition, State Farm's answer in this case does not assert any exclusions as an affirmative defense. Consequently, State Farm cannot, in my opinion, justify its denial of the first claim (or the second claim, as discussed *infra*.) on the basis of any exclusions. *See,* Buzzard v. Farmers Ins. Co., Inc., 824 P.2d 1105, 1114 (Okla. 1991) ("The information relevant at trial [of a bad faith claim] was that upon which Farmers relied in denying payment"); Continental Cas. Co. v. Beatty, 455 P.2d 684, 688 (Okla. 1969) (breach of post-loss notice condition in policy was an affirmative defense which was

July 18, 2011
Page 32

waived if not alleged); and <u>Moral Ins. Co. v. Moon</u>, 272 P.2d 378, 379 (Okla. 1954) (defense in avoidance of an insurance contract is an affirmative defense which is waived unless affirmatively alleged).

State Farm denied the first claim in Romanello's October 20, 2008 letter to Mr. Hayes, reaffirmed in her February 26, 2009 letter. Hayes 37 & 40. The initial letter states "We are unable to offer any payment on the damages to your boat dock as we were not given an opportunity to inspect the dock prior to repairs being made....". The letter then quotes parts of paragraph 2 of the SECTION I – CONDITIONS of the policy [POLICY 27] which in pertinent part states:

2. **Your Duties After Loss**. After a loss to which this insurance may apply, you shall see that the following duties are performed:

    a. give immediate notice to us or our agent....;

    b. protect the property from further damage or loss, make reasonable and necessary temporary repairs required to protect the property, keep an accurate record of repair expenditures;
***

    d. as often as we reasonably require:

        (1) exhibit the damaged property;
***

[POLICY 27].

## G. Effect of State Farm Agent Telling Hayes Claim Was Covered.

The letters fail to mention that Mr. Hayes repeatedly explained to State Farm adjusters that the reason he authorized Affordable Dock Service to complete the repairs to the dock, without an adjuster blessing the completion of the repairs, is because State Farm's agent, Corcoran, told Hayes when he reported the dock damage to her on September 15, 2008, that the damage was covered by his policy. While Corcoran denies making this statement, there is no such denial recorded in the log which includes at least thirteen communications between at least eight State Farm adjusters and supervisors with the agent during the pendency of the first claim. See SF 13, 9-16-08 Mills and Thompson entries; SF 8, 10-17-08 Erickson entry and 10-20-08 Dixon entry; SF 7, 12-8-08 Rice entry; SF 6, 1-9-09 Anderson entry; SF 5, 2-18-09 Mills and Quillinn entries and 2-19-09 Dixon entries; SF 4, 2-23-09 Chargois and Dixon entries; and SF 3, 3-6-09 Tollett and 3-11-09 Romanello entries. Nor is there any evidence in the log that the State Farm adjusters took a statement from the agent to find out exactly what the agent claims to have told Mr. Hayes. Finally, there is no evaluation in the claim file of the significance of a State Farm agent telling an insured his loss is covered, and the insured proceeding to act on this representation by completing repairs to damaged property for which he has made a claim, when the

July 18, 2011
Page 33

insurance company subsequently denies the claim because it was not allowed to inspect the damaged properties before the repairs were made.

As an expert, I do not opine on the credibility of Mr. Hayes or the State Farm agent. However, I can evaluate whether State Farm should have investigated Mr. Hayes' statement about what the State Farm agent told him, and the impact of the statement by the agent, if in fact made to Mr. Hayes, on State Farm's evaluation of the first claim.

The law has long been clear that an insurance company may be precluded from relying upon exclusions and post-loss policy conditions such as the **Your Duties After Loss** paragraph, when an agent of the insurance company with actual or apparent authority to speak for the company makes representations to the insured, which caused the insured not to comply with the condition or otherwise to act to his detriment. *See e.g.,* Liverpool & London & Globe Ins. Co.v. Cargill, 145 P. 1136 (Okla. 1914) (Syl. 3); Springfield Fire & Mut. Ins. Co. v. Fine, 216 P. 898 (Okla. 1923) (Syl. 3-5); Old Surety Life Ins. Co. v. Miller, 333 P.2d 504 (Okla. 1958) (Syl.); and Security Ins. Co. of New Haven v. White, 236 F.2d 215, 218-19 (10th Cir. 1956) (Okla. law).

American Eagle Fire Ins. Co. v. Burdine, 200 F.2d 26, 29 (10th Cir. 1952) states the long standing Oklahoma law:

> it is a well recognized principle of equitable waiver and estoppel that if an insurance company through those who are authorized to speak for it, either by words or conduct, has induced an insured from that which he is obligated to do under the conditions of the policy, it will be deemed to have waived the requirements and may be estopped to deny authority of its agent on whose conduct or representations the insured relied to his detriment.

The representations and conduct of an insurance company's agent concerning whether a policy affords coverage for a claim, if relied upon an insured to his detriment, are included within this rule. "An insurer may by his action or conduct be estopped from denying that his policy affords coverage for a risk the insured has been led honestly to believe was assumed under the terms of the policy". Insurance Co. of New Haven v. Greer, 437 P.2d 243, 245-46 (Okla. 1968). This principle was applied in United Serv. Auto. Assoc. v. Royal-Globe Ins. Co., 511 F.2d 1094, 1096-97 (10th Cir. 1975); State Farm Mut. Auto. Ins. Co. v. Mid-Continent Cas. Co., 518 F.2d 292, 298 (10th Cir. 1975) (where State Farm successfully invoked this principle against another insurance company); and In re: Cooper Manuf'ing Corp., 131 F.Supp.2d 1238, 1252 & n.7 (N.D. Okla. 2001).

In any dispute between an insured and his insurance company, the Insurance Code makes the agent who solicited the application for insurance the agent of the insurance company. 36 O.S. § 1435.3(A). *See e.g.,* Cook v. Medical Savings Ins. Co., 2006 WL 1049253 at *1 (W.D. Okla. April 13, 2006) (holding soliciting agent was agent of the insurance company as a matter of law under the statute). Moreover, Corcoran is an exclusive agent of State Farm; she cannot place business with other insurance companies. Thus, Corcoran is a "captive agent" of State Farm whose conduct in representations is

July 18, 2011
Page 34

binding upon it in a dispute with a State Farm insured. *E.g.,* Vos v. Farm Bur. Life Ins. Co., 667 N.W.2d 36, 42 (Iowa 2003); Lewis-Williamson v. Grange Mut. Ins. Co., 39 P.3d 947, 948 (Or. App. 2002); and Hart v. Farmers Ins. Exch., 597 N.W.2d 47, 50 (Mich. 1997). This is true even if the State Farm agent did not have actual authority of State Farm to represent to Mr. Hayes that his loss was covered. "An insurance company is bound by the apparent authority of its agent where a third person, in good faith, acts and/or relies thereon without any knowledge of a limitation upon the actual or expressed authority of such agent." Cunningham v. North British & Mercury Ins. Co. Ltd., 66 P.2d 515 (Okla. 1937) (Syl. 1). The apparent authority extends to acts necessary to properly process a claim under the policy. New York Life Ins. Co. v. Riggins, 61 P.2d 543 (Okla. 1936) (Syl. 3).

The claim file does not show State Farm took this agency law into account in deciding to deny the first claim because of a violation of the **Your Duties After Loss** condition which required Mr. Hayes "as often as [State Farm] reasonably requires" to "exhibit the damaged property". State Farm also did not investigate or evaluate whether agent Corcoran actually made the representations to Mr. Hayes that he attributed to her. It is clear, however, from the log entries of the statements he made, as well as his deposition, that he claims to have proceeded with repairs to the dock based upon those representations.

As the law is well established and State Farm was told by Mr. Hayes what a State Farm agent had told him before it denied his claim, the failure to investigate and evaluate the significance of the statements Mr. Hayes attributes to State Farm's agent was unreasonable, violated industry standards regarding an unbiased and thorough investigation, and State Farm's own standard requiring it to conduct such an investigation. Moreover, State Farm violated its own Operation Guide which specifically applies to the reconsideration of a denied claim if a mistake was made the first time the claim was denied. Having denied the claim in the October 20, 2008 letter, State Farm thereafter considered whether to pay that portion of the repair cost for the dock that it considered "temporary" repairs. During this reconsideration State Farm never evaluated the significance of the statements Mr. Hayes attributed to the agent. Instead, State Farm reaffirmed its original denial in February 2009 letter.

### H. Immediate Notice as Reason to Deny First Claim.

In denying the first claim for violation of the **Your Duties After Loss** condition, State Farm failed to explain why or how Mr. Hayes violated subparagraphs a and b of the condition. The entire focus in the claim file was on Mr. Hayes' authorizing the remaining repairs to go forward without allowing State Farm to examine the dock in its post-loss but pre-repair state, allegedly a violation of paragraph c of the condition.

There is no evidence or evaluation in the claim file of violations of subparagraph a requiring Mr. Hayes to "give immediate notice to us or our agent". Mr. Hayes was informed of the damage to the dock by persons at Grand Lake while he was not there during the weekend of September 13 and 14, 2008. The agent reported the claim to State Farm at 1:06 p.m. on September 15. See SF 13, 9-15-08 Corcoran entry. Therefore,

July 18, 2011
Page 35

sometime after Mr. Hayes received phone calls from persons at Grand Lake regarding the damage to the dock, and 1:06 p.m. on September 15, he reported the damage to the agent.

Whether notice is "immediate" depends upon the circumstances under which an insured becomes aware of a loss which may be covered by his policy and generally means a "reasonable time". *See e.g.*, Provident Life & Accid. Ins. Co. v. Henson, 101 P.2d 838 (Okla. 1940) (Syl.); Palacine Oil Co. v. Commercial Cas. Ins. Co., Newark, N.J., 75 F.2d 20, 22-23 (10th Cir. 1935) (applying Oklahoma law). The loss subject to the first claim appears to have occurred on a weekend and State Farm's agent knew of it on the first workday thereafter. Had State Farm investigated or evaluated why it did not receive notice until Monday, September 15, it would have known, as Mr. Hayes testified in his deposition, that he was not at his Grand Lake property over the weekend when the dock was damaged, finding out about it only by telephone calls from his neighbors and his residential contractor, and thereafter that he advised State Farm's agent upon receiving these reports. In these circumstances it was totally unreasonable to deny the first claim for breach on the ground that Mr. Hayes did not provide "immediate" notice of the loss.

Paragraph b required Mr. Hayes to "protect the property from further damage or loss, make reasonable and necessary temporary repairs required to protect the property". The duty to protect insured property from further loss incorporates the common law duty of an insured "'to do all he can to lighten the burden of probable or possible loss, and to exert himself to save, as far as he reasonably can, the property from threat and destruction'". Commercial Union Assur. Co. v. Planters Cooperative Assoc. of Lone Wolf, 252 P.2d 146, 149, *quoting from* COUCH, ENCYCLOPEDIA OF INSURANCE LAW § 1221. Such a condition is "for the company's protection against liability for greater loss". Slay Warehousing Co., Inc. v. Reliance Ins. Co., 471 F.2d 1364, 1367 (8th Cir. 1973). Whether an insured violated this condition "is not to be determined by the actual result, nor by the judgment of professional experts….It is to be determined by the circumstances of the case as they appeared to those who acted upon them". Harper v. Pelican Trucking Co., 176 So.2d 767, 772 (La. App. 1965) (int. qt. mks. omit.).

In the Commercial Union case the Oklahoma Supreme Court held the insurance company was precluded from denying coverage when its agent informed the insured it was permissible to take action in accord with a post-loss condition like paragraph b of the **Your Duties After Loss** clause. 252 P.2d at 149. Consequently, if Hayes was told by State Farm's agent Corcoran that the loss was covered by his policy, State Farm had no reasonable basis to assert it needed to inspect the dock before the repairs were completed and, accordingly, acted unreasonably in denying coverage for the first claim on the basis of the breach of the condition requiring Mr. Hayes to "exhibit the damaged property".

State Farm's denial of the first claim on this basis was also unreasonable because, as previously discussed, State Farm never investigated whether its agent represented to Mr. Hayes that coverage existed for the loss, and because State Farm never evaluated the legal aspect of such a representation on the application of the post-loss conditions upon which it relied to deny coverage.

July 18, 2011
Page 36

**I.  State Farm Failed to Prove What Part of Loss Was Caused by Violations of Your Duties After Loss Condition.**

Moreover, State Farm acted unreasonably in completely denying the claim on the basis of the paragraph b condition because the law is clear that "if the insured fails to mitigate the loss, the insurer is not liable for any portion of the loss **which it can prove is attributable to that failure**".  COUCH ON INSURANCE 3d § 178.10 (emp. add.).  In other words, violation of the condition does not eliminate coverage entirely for all of the damages to the deck, but only for that part of the damage which **State Farm proves** occurred because Mr. Hayes did not comply with the condition.  *See e.g.,* Gage v. Connecticut Fire Ins. Co., 127 P. 407, 408 (Okla. 1912); Brocato v. Sun Underwriters Ins. Co., 53 So.2d 246, 251 (La. 1951); Messler v. Williamsburg City Fire Ins., 108 A. 832, 836 (R.I. 1920); Kyrimes v. Standard Ins. Co. of New Jersey, 276 N.Y.S. 309, 310 (App. Div. 1934) *aff'd* 196 N.E. 601 (N.Y. 1935); Jablonski v. Girard Fire & Mut. Ins. Co. of Philadelphia, 174 A. 689, 690 (N.J. 1934); Kramnicz v. First Nat'l Bank of Greene, 302 N.Y.S.2d 22, 27 (App. Div. 1969); Henri's Food Products Co., Inc. v. Home Ins. Co., 474 F.Supp. 889, 892 (E.D. Wis. 1979); Higginbotham v. New Hampshire Indem. Co., 498 So.2d 1149, 1151-52 (La. App. 1986) *writ. den'd* 501 So.2d 236 (La. 1987); Bass v. Illinois Fair Plan Assoc., 424 N.E.2d 908, 910 (Ill. App. 1981); and Central Nat'l Ins. Co. of Omaha v. Dickson, 373 S.E.2d 849, 852 (Ga. App. 1988).

These cases are consistent with more recent Oklahoma law.  In First Bank of Turley v. Fid. & Dep. Ins. Co. of Md., 928 P.2d 298 (Okla. 1996), a bad faith case predicated upon the insurer's unreasonable failure to defend its insured in a lawsuit, the insurer defended on the ground that the insured, after the insurer first refused to defend, failed to keep the insurer advised of information which would trigger a duty to defend, in breach of the notice of suit condition and cooperation requirements of the policy and common law.  The court held that if the insured failed to keep the liability insurer advised of developments in the case after the insurer initially refused to defend which were material to a determination of whether the insurer should reconsider its decision not to defend, this omission potentially could reduce the damages otherwise recoverable by the insured for bad faith refusal to defend.  *Id.* at 308.

The claim file contains no recognition of this established law, only that subsequent to the original denial of the claim, State Farm denied it again in its entirety after the adjusters and their supervisors opined that the repairs made by Affordable Dock were all permanent and not "temporary".  See SF 7, 11-11-08 Romanello entry; SF 5, 2-17-09 Romanello entry; SF 4, 2-19-09 Romanello and 2-23-09 Dixon entries.  State Farm acted unreasonably in failing to acknowledge that it would owe the entire amount of the repairs unless it could prove what portion of the repairs were necessitated because Mr. Hayes had failed to comply with one of the paragraphs in the **Your Duties After Loss Condition**.  State Farm never even attempted to develop any such information.  Instead, it focused, as noted above, on whether it should pay for some "temporary" repairs after it initially denied the claim. The only reason it did so is because the policy contains an "additional" coverage which states: "If damage is covered by a Loss Insured, we will pay the reasonable and necessary

costs you incur for temporary repairs to protect the property from further immediate damage or loss".   POLICY 13, SECTION I – ADDITIONAL COVERAGES ¶2. **Temporary Repairs**.   By considering payment under this clause, State Farm acknowledged that the damage to the dock was in fact a covered loss (since it ultimately decided some of the repairs were "temporary" but the cost did not exceed the deductible amount).  This is because the **Temporary Repairs** additional coverage only applies if the damage to the dock was caused "by a Loss Insured", i.e. an accidental direct physical loss not subject to any exclusions.

### J.   State Farm Must Prove Prejudice To Deny Either Claim for Violation of the Your Duties After Loss Condition.

State Farm could not deny either or Mr. Hayes' claims on the basis of a violation of the **Your Duties After Loss** conditions unless it proved that it was prejudiced by such a violation, because there is no language in the policy which expressly states a forfeiture of coverage will result if the insured does not comply with the **Your Duties After Loss** clause.  This is the consistent view of the Oklahoma courts with regard to a multitude of post-loss conditions. *See,* Dickson v. State Mut. Ins. Co., 126 P. 794, 795-96 (Okla. 1912) (violation of condition requiring notice of loss within 48 hours of a fire and submission of proof of loss within 60 days of loss held not grounds to deny coverage under a fire policy, absent proof by the insurance company it was prejudiced); Fox v. National Savings Ins. Co., 424 P.2d 19, 25 (Okla. 1967) (violation of condition in liability policy requiring notice of accident "as soon as practicable" can be used to avoid coverage only if the insurer carries its burden to plead and prove prejudice as a result of the violation); Continental Cas. Co. v. Beaty, 455 P.2d at 688 (violation of condition in group disability policy regarding written notice of claim "within 20 days after the occurrence or commencement of any loss covered by this policy", did not avoid coverage for the disability claim since the insurer neither asserted nor proved that the failure to receive notice in accordance with the condition had caused prejudice to it); Independent Sch. Dist. No. 1 of Tulsa County v. Jackson, 608 P.2d 1153, 1155-56 (Okla. 1980) (insurer proved it was prejudiced by insured's violation of condition in liability policy requiring him, upon being sued, to "immediately forward" the suit papers to the insurer, because the insured never notified the insurer at all that he had been sued and allowed a default judgment to be entered against him without notice to the insurer); O'Neill v. Long, 54 P.3d 109, 116 n.11 (Okla. 2002) (State Farm failed to prove prejudice from the breach of the cooperation condition by its insureds); State Farm Mut. Auto. Ins. Co. v. Koval, 146 F.2d 118 (10th Cir. 1944) (under Oklahoma law State Farm did not prove a violation of a condition in a liability policy requiring the insured to cooperate with the insurer by attending trial resulted in prejudice to State Farm's defense of the case against the insured); Dang v. UNUM Life Ins. Co. of Am., 175 F.3d 1186, 1189-90 (10th Cir. 1999) (condition requiring notice within 30 days of date disability started in group long term disability policy subject to ERISA would excuse payment only if the insurer was prejudiced by late notice, the court borrowing Oklahoma's "notice prejudice" rule to apply as federal common law); Winters v. State Farm Fire & Cas. Co., 35 F.Supp.2d 842, 845-46 (E.D. Okla. 1999) (under Oklahoma and Kansas law a refusal to submit to an examination under oath as required by a post-loss condition could be used to avoid coverage by State Farm only if it demonstrated prejudice to its

July 18, 2011
Page 38

investigation by the refusal); and <u>Melton Truck Lines, Inc. v. Indemnity Ins. Co. of N. Am.</u>, 2006 WL 1876528 at *2 (N.D. Okla. June 26, 2006) (under Oklahoma law, whether a violation of a notice of occurrence and suit condition in an excess liability policy was a ground to deny coverage, depended upon whether the excess insurer was prejudiced by late notice).

Although the Oklahoma cases have not considered whether a violation of the "right to inspect" post loss condition also requires a showing of prejudice by the insurance company, there is no reason to believe that the Oklahoma courts would reach a conclusion different than others. *See*, <u>A&W Artesian Well Co. v. Aetna Cas. & Sur. Co.</u>, 463 A.2d 1381, 1382-83 (R.I. 1983) (prejudice must be shown by insurer in order to avoid payment of claim for violation of the inspection of property condition, the Rhode Island court applying its case law regarding prejudice as a result of the failure to provide timely notice); <u>Schultz v. Queen Ins. Co.</u>, 399 S.W.2d 230, 234-35 (Mo. App. 1965) (insurer must plead prejudice because it has burden of proof to demonstrate it was prejudiced by the failure of the insured to make the damaged property available for inspection).

The claim file contains nothing to suggest the adjusters or their supervisors even recognized State Farm cannot deny a claim for violation of a **Your Duties After Loss** conditions unless it proves itself to have been prejudiced by a violation.   Lack of knowledge of fundamental principles violates both industry standards and State Farm's own Operation Guide which require knowledge of applicable law.  Such knowledge is also an essential requirement of the duty of good faith and fair dealing.  Thus, the denial of the first claim without demonstrating prejudice was in clear violation of established law and claims handling standards.  It is perhaps for this reason that State Farm's answer to the second amended complaint does not affirmatively allege what State Farm has the burden to prove, prejudice from the alleged breach of the **Your Duties After Loss** condition.  Under established Oklahoma law previously discussed, a failure to assert prejudice as a basis for denial of the first claim, and the failure to affirmatively plead it as a defense, precludes State Farm from justifying its denial of payment on the ground that Mr. Hayes violated the **Your Duties After Loss** condition.

In any event, had State Farm retained an expert, he or she could have examined the post-loss/pre-repair photos and the repaired dock, to evaluate whether the damage was caused by an excluded peril.  The expert may have been able to express such an opinion. However, State Farm elected not to retain an expert so it never found out if an expert could determine if the damage which was repaired was caused by waves or any other excluded peril.

### K. More on Denial of the Second Claim: Exclusions.

On March 11, 2009 State Farm's agent reported to State Farm that the "DOCK SUNK FROM HIGH WINDS".  SF 85, 3-11-09 Corcoran entry.  State Farm opened a new claim, 36-F612002, for the dock sinking.  An adjuster called Mr. Hayes on March 13, 2009, according to the log note Mr. Hayes told the adjuster:

He said the top of the dock blew off, and the rest of it just followed. It capsized and sank. Part of it sank, and he paid someone to come out and clean it up. He said the same people that did the temporary repairs. The neighbor (in Langley) called him and the lake patrol called him. Then he said about 4 or 5 people called him that morning. He said he doesn't know the exact date, but it was about two weeks later that it sank. He says he does not have a copy of the bill where they did the cleanup, but says he has a copy of the check. He says he spent about $4,000 to $5,000 to clean it up....I asked again if he ever told previous CR about the dock sinking, he said no. Expld that we will probably need to come out and inspect.... [SF 84, 3-13-09 Schafer entry].

There is no description of any inspection after this phone conversation in the claim file, but State Farm enlisted its Special Investigation Unit (SIU) to investigate the second claim because it appeared "suspicious". The State Farm adjusters reviewed the file for a different claim by a neighbor of Mr. Hayes, claim 36-F605-947. This appears to be a claim by the neighbor for the sinking of a boat he kept in the Hayes' dock. See SF 83, SIU Closing Report. I do not have the file for the neighbor's claim so I don't know if State Farm paid for the boat or not and, if it did not, why not. However, it appears the date reported to have sunk was November 20, 2008. If as stated in the SIU Closing Report entry, the dock and boat were reported to have sunk at the same time, the dock sunk November 20, 2008, not approximately two weeks after the original damage, as reported by Mr. Hayes.

The claim file reviews no other investigation of the second claim except to review the photos in the first claim file and possibly photos in the neighbor's boat claim file. No effort was made to find out if any eyewitnesses to the sinking or of high winds at the time the dock sunk existed. It does not even appear the neighbor who had a claim for a sunken boat was interviewed to see what he knew about the circumstances under which the dock reportedly sunk. Instead, State Farm denied the second claim by letter dated May 20, 2009, SF 106.

The following is the extent of explanation to Mr. Hayes for the denial of the second claim in that letter:

We have completed our investigation of your recent boat dock loss. We are unable to make payment on your claim due to the following reasons: 1.     The     loss was not reported in a timely fashion; 2. We were not allowed an opportunity to inspect; and 3. There is a question as to whether the property sustained damage insured under the policy. [SF 106].

After this statement three and a half pages of the letter are used to quote verbatim exclusions 1.a, 1.c, 1.g, 1.l, 2.c, 2.d, 3.b and 3.c, as well as parts of the **Your Duties After Loss** condition. No explanation of how any of these exclusions apply to the second claim is provided in the letter, except the cryptic introduction I quoted. The letter itself thus violates the OUCSPA, 36 O.S. § 1250.7(A) and industry standards, for communicating a denial of a claim in a manner in which an insured can understand the basis for the denial.

July 18, 2011
Page 40

More fundamentally, the claim file contains no indication that State Farm had any evidence supporting the application of any of the cited exclusions (on which it has the burden of proof). There is no evaluation in the file for the second claim of any of the exclusions cited in the letter or even of the **Your Duties After Loss** condition. The exclusions are not even mentioned in the claim file. At least with regard to the first claim the supervisor mentioned the exclusions to be cited in the denial letter (although they subsequently were not cited in that letter). It is most unreasonable and a violation of industry standards and State Farm's Operation Guide requiring a fair and thorough investigation, for State Farm to deny the second claim on the basis of multiple exclusions it never investigated or evaluated, or even mentioned in its claim file. Tellingly perhaps, State Farm's answer to the second amended complaint does not plead the exclusions identified in the second claim denial letter as a defense to payment of the second claim. Under the law previously discussed, State Farm cannot now, in my opinion, seek to justify denial of payment of the second claim on the basis of any exclusions.

### L. Impact of Denial of Coverage for Second Claim on Alleged Violation of Your Duties After Loss Condition.

The other grounds for denial of the second claim cited in the letter are lack of timely notice and lack of an opportunity to inspect. As discussed with regard to the first claim, violation of these conditions cannot be used to deny a claim unless State Farm proves it was prejudiced by the violations. The denial letter does not even mention how State Farm was prejudiced, and there is no evaluation of such prejudice recorded in the file for the second claim, or description of evidence to support the conclusion that such prejudice exists. Moreover, as already discussed regarding the first claim, State Farm has not affirmatively alleged such prejudice in its answer to the second amended complaint. Under the established Oklahoma law discussed with regard to the first claim, State Farm cannot seek to justify its denial of the second claim on the basis of violations of the **Your Duties After Loss** condition.

An insurance company also may not, on the one hand, deny a claim because it is not covered by the policy and, on the other hand, complain that post-loss conditions were violated. The reason is obvious – if there is no coverage then there is no benefit to the insurance company in insisting that the insured comply with post-loss conditions which are solely for the insurance company's benefit. *See e.g.,* Continental Ins. Co. v. Portwood, 84 P.2d 435 (Okla. 1938) (Syl. 2 – denial of claim excuses insured from complying with proof of loss condition); Western Cas. & Sur. Co. v. Lund, 132 F.Supp. 867, 870-71 & n.9 (W.D. Okla. 1955) *aff'd* 234 F.2d 916 (10th Cir. 1956) (under Oklahoma law insurer was precluded from asserting untimely notice and forwarding of suit papers to insurer where the insurer denied liability coverage on the ground the policy had been cancelled prior to the accident); Buzzard v. Farmers, 824 P.2d at 1114 (once insurer denied uninsured motorist claim on the ground that the insured had not satisfied the requirements of the insuring agreement that he be legally entitled to recover form the owner or operator of an uninsured motor vehicle, the insurer was precluded from asserting the insured breached the subrogation clause of the UM coverage by settling with the owner of the uninsured vehicle and releasing the claim against the vehicle owner which by law also released the

July 18, 2011
Page 41

subrogation claim); and <u>Traders & Gen. Ins. Co. v. Rudco Oil & Gas Co.</u>, 129 F.2d 621, 624 (10th Cir. 1942) (under Oklahoma law a condition prohibiting the insured from entering into a voluntary settlement in a liability policy could not be enforced where the insurer had previously denied coverage for the claim against the insured).

A violation of the right to inspect post-loss condition has also been held not to be a defense where the insurer denies coverage on the merits of the claim. "Since defendant asserted from the beginning that it had no liability under the terms of the policy, it is hard pressed to complain that plaintiff failed to comply with the requirement to protect the policy from further harm". <u>Central Nat'l Ins. v. Dickson</u>, 373 S.E.2d at 851. *Accord:* <u>Farm Bur. Ins. Co. v. Ward</u>, 528 S.W.2d 910, 912 (Ark. 1975).

The claim file does not reflect any understanding of this established principle. Reliance by State Farm on violation of post-loss conditions to deny the second claim, while at the same time relying on multiple exclusions from coverage to deny the claim, was contrary to this established law and thus unreasonable, a violation of industry standards requiring compliance with applicable law, and a violation of State Farm's own claim practice rules which also instruct adjusters to apply applicable law where inconsistent with policy provisions.

### M. Denial for Depriving State Farm of Right to Inspect the Sunken Dock.

One final note about the ground of denial on the basis of being deprived of a right to inspect the boat dock. The dock was reported to have sunk. Hayes told the adjuster "there is not a boat dock anymore – it has been cleaned up....He said we could inspect anytime – no one is there, but does have some people working on home". SF 52, 4-13-09 Andrew entry. No record of any inspection of the insured property after this date is in the claim file. Thus, the file proves there was no insured dock to inspect, and State Farm was not denied the right to inspect. It chose not to inspect the area where the dock sunk. It took no action to locate the boat dock in Grand Lake if in fact it had sunk, something it reasonably could have done if it intended to deny the second claim on the basis of the multiple exclusions cited in the denial letter and on the basis of the lack of a right of inspection. The denial letter, therefore, contained a misrepresentation that State Farm was denied the opportunity to inspect. The dock had sunk and so was not readily available to be inspected, as State Farm knew. Mr. Hayes told the adjuster he "could inspect anytime" but State Farm did not do so. This misrepresentation is a misleading communication of the basis for denial of the second claim, and it was unreasonable because it is directly contrary to the statements of Mr. Hayes recorded in the claim file by a State Farm adjuster.

Very truly yours,

Mort G. Welch

MGW:vm